WILLIAM SCHOONMAKER ET AL. *v.* LAWRENCE BRUNOLI, INC., ET AL.
(SC 16785)

Borden, Norcott, Palmer, Vertefeuille and Zarella, Js.

---

Argued December 13, 2002—officially released August 5, 2003

*Timothy Brignole*, with whom was *Juri Taalman*, for the appellants-appellees (plaintiffs).

*John C. Fitzgerald, Jr.*, for the appellees-appellants (defendants).

*Opinion*

NORCOTT, J. This appeal[1] arises out of an action brought by the plaintiff employees[2] against the named defendant, Lawrence Brunoli, Inc., and certain of its

---

[1] The plaintiffs appealed, and the defendants cross appealed, from the judgment of the trial court to the Appellate Court. We transferred both the appeal and the cross appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[2] The plaintiffs in this matter are William Schoonmaker, Richard M. Scheller, Jr., Gerry Blejewski, William Berlepsch, Miro Tanski and Michael Gianelli. We refer to them collectively as the plaintiffs, and individually by name when appropriate.

officers,[3] wherein the plaintiffs alleged that, with respect to three separate public works construction projects at the Oliver Wolcott School in Torrington (Wolcott School), the University of Connecticut in Storrs (UCONN), and the Cedarcrest Hospital in Newington, the defendants had failed to pay the plaintiffs the proper prevailing wages and fringe benefits in accordance with General Statutes § 31-53,[4] and over-

[3] The defendants in this matter are Lawrence Brunoli, Inc., a corporation licensed to do business and with its principal place of business in the state of Connecticut, engaged in the business of, inter alia, general contracting and construction; Lawrence Brunoli, Sr., a director and officer of the corporation, and Lawrence Brunoli, Jr., also a director and officer of the corporation. We refer to them collectively as the defendants, and individually by name when appropriate.

The plaintiffs also initially had named Fireman's Insurance Company, the company that had bonded the defendants' construction contracts, as a defendant in this case. The plaintiffs, however, subsequently withdrew that count of their complaint. Accordingly, Fireman's Insurance Company is not a party to this appeal.

[4] General Statutes § 31-53 provides: "(a) Each contract for the construction, remodeling, refinishing, refurbishing, rehabilitation, alteration or repair of any public works project by the state or any of its agents, or by any political subdivision of the state or any of its agents, shall contain the following provision: 'The wages paid on an hourly basis to any mechanic, laborer or workman employed upon the work herein contracted to be done and the amount of payment or contribution paid or payable on behalf of each such employee to any employee welfare fund, as defined in subsection (h) of this section, shall be at a rate equal to the rate customary or prevailing for the same work in the same trade or occupation in the town in which such public works project is being constructed. Any contractor who is not obligated by agreement to make payment or contribution on behalf of such employees to any such employee welfare fund shall pay to each employee as part of his wages the amount of payment or contribution for his classification on each pay day.'

"(b) Any person who knowingly or wilfully employs any mechanic, laborer or workman in the construction, remodeling, refinishing, refurbishing, rehabilitation, alteration or repair of any public works project for or on behalf of the state or any of its agents, or any political subdivision of the state or any of its agents, at a rate of wage on an hourly basis which is less than the rate customary or prevailing for the same work in the same trade or occupation in the town in which such public works project is being constructed, remodeled, refinished, refurbished, rehabilitated, altered or repaired, or who fails to pay the amount of payment or contributions paid or payable on behalf of each such employee to any employee welfare fund,

time wages as required by General Statutes §§ 31-53,

or in lieu thereof to the employee, as provided by subsection (a), shall be fined not less than two thousand five hundred dollars but not more than five thousand dollars for each offense and (1) for the first violation, shall be disqualified from bidding on contracts with the state or any political subdivision until the contractor or subcontractor has made full restitution of the back wages owed to such persons and for an additional six months thereafter and (2) for subsequent violations, shall be disqualified from bidding on contracts with the state or any political subdivision until the contractor or subcontractor has made full restitution of the back wages owed to such persons and for not less than an additional two years thereafter. In addition, if it is found by the contracting officer representing the state or political subdivision thereof that any mechanic, laborer or workman employed by the contractor or any subcontractor directly on the site for the work covered by the contract has been or is being paid a rate of wages less than the rate of wages required by the contract to be paid as required by this section, the state or contracting political subdivision thereof may (A) by written notice to the contractor, terminate such contractor's right to proceed with the work or such part of the work as to which there has been a failure to pay said required wages and to prosecute the work to completion by contract or otherwise, and the contractor and his sureties shall be liable to the state or the contracting political subdivision for any excess costs occasioned the state or the contracting political subdivision thereby or (B) withhold payment of money to the contractor or subcontractor. The contracting department of the state or the political subdivision thereof shall within two days after taking such action notify the Labor Commissioner in writing of the name of the contractor or subcontractor, the project involved, the location of the work, the violations involved, the date the contract was terminated, and steps taken to collect the required wages.

"(c) The Labor Commissioner may make complaint to the proper prosecuting authorities for the violation of any provision of subsection (b).

"(d) For the purpose of predetermining the prevailing rate of wage on an hourly basis and the amount of payment or contributions paid or payable on behalf of each employee to any employee welfare fund, as defined in subsection (h), in each town where such contract is to be performed, the Labor Commissioner shall (1) hold a hearing at any required time to determine the prevailing rate of wages on an hourly basis and the amount of payment or contributions paid or payable on behalf of each person to any employee welfare fund, as defined in subsection (h), upon any public work within any specified area, and shall establish classifications of skilled, semi-skilled and ordinary labor, or (2) adopt and use such appropriate and applicable prevailing wage rate determinations as have been made by the Secretary of Labor of the United States under the provisions of the Davis-Bacon Act, as amended.

"(e) The Labor Commissioner shall determine the prevailing rate of wages

on an hourly basis and the amount of payment or contributions paid or payable on behalf of such employee to any employee welfare fund, as defined in subsection (h), in each locality where any such public work is to be constructed, and the agent empowered to let such contract shall contact the Labor Commissioner, at least ten but not more than twenty days prior to the date such contracts will be advertised for bid, to ascertain the proper rate of wages and amount of employee welfare fund payments or contributions and shall include such rate of wage on an hourly basis and the amount of payment or contributions paid or payable on behalf of each employee to any employee welfare fund, as defined in subsection (h), or in lieu thereof the amount to be paid directly to each employee for such payment or contributions as provided in subsection (a) for all classifications of labor in the proposal for the contract. The rate of wage on an hourly basis and the amount of payment or contributions to any employee welfare fund, as defined in subsection (h), or cash in lieu thereof, as provided in subsection (a), shall, at all times, be considered as the minimum rate for the classification for which it was established. Prior to the award of any contract subject to the provisions of this section, such agent shall certify in writing to the Labor Commissioner the total dollar amount of work to be done in connection with such public works project, regardless of whether such project consists of one or more contracts. Upon the award of any contract subject to the provisions of this section, the contractor to whom such contract is awarded shall certify, under oath, to the Labor Commissioner the pay scale to be used by such contractor and any of his subcontractors for work to be performed under such contract.

"(f) Each employer subject to the provisions of this section or section 31-54 shall (1) keep, maintain and preserve such records relating to the wages and hours worked by each employee and a schedule of the occupation or work classification at which each mechanic, laborer or workman on the project is employed during each work day and week in such manner and form as the Labor Commissioner establishes to assure the proper payments due to such employees or employee welfare funds under this section or section 31-54, and (2) submit monthly to the contracting agency a certified payroll which shall consist of a complete copy of such records accompanied by a statement signed by the employer which indicates that (A) such records are correct; (B) the rate of wages paid to each mechanic, laborer or workman and the amount of payment or contributions paid or payable on behalf of each such employee to any employee welfare fund, as defined in subsection (h) of this section, are not less than the prevailing rate of wages and the amount of payment or contributions paid or payable on behalf of each such employee to any employee welfare fund, as determined by the Labor Commissioner pursuant to subsection (d) of this section, and not less than those required by the contract to be paid; (C) the employer has complied with the provisions of this section and section 31-54; (D) each such employee is covered by a workers' compensation insurance policy for the duration

of his employment, which shall be demonstrated by submitting to the contracting agency the name of the workers' compensation insurance carrier covering each such employee, the effective and expiration dates of each policy and each policy number; (E) the employer does not receive kickbacks, as defined in 41 USC 52, from any employee or employee welfare fund; and (F) pursuant to the provisions of section 53a-157a, the employer is aware that filing a certified payroll which he knows to be false is a class D felony for which the employer may be fined up to five thousand dollars, imprisoned for up to five years, or both. This subsection shall not be construed to prohibit a general contractor from relying on the certification of a lower tier subcontractor, provided the general contractor shall not be exempted from the provisions of section 53a-157a if he knowingly relies upon a subcontractor's false certification. Notwithstanding the provisions of section 1-210, the certified payroll shall be considered a public record and every person shall have the right to inspect and copy such records in accordance with the provisions of section 1-212. The provisions of sections 31-59(a), 31-59(b), 31-66 and 31-69 which are not inconsistent with the provisions of this section or section 31-54 shall apply to this section. Failing to file a certified payroll pursuant to subdivision (2) of this subsection is a class D felony for which the employer may be fined up to five thousand dollars, imprisoned for up to five years, or both.

"(g) The provisions of this section shall not apply where the total cost of all work to be performed by all contractors and subcontractors in connection with new construction of any public works project is less than four hundred thousand dollars or where the total cost of all work to be performed by all contractors and subcontractors in connection with any remodeling, refinishing, refurbishing, rehabilitation, alteration or repair of any public works project is less than one hundred thousand dollars.

"(h) As used in this section, section 31-54 and section 31-89a, 'employee welfare fund' means any trust fund established by one or more employers and one or more labor organizations or one or more other third parties not affiliated with the employers to provide from moneys in the fund, whether through the purchase of insurance or annuity contracts or otherwise, benefits under an employee welfare plan; provided such term shall not include any such fund where the trustee, or all of the trustees, are subject to supervision by the Commissioner of Banking of this state or any other state or the Comptroller of the Currency of the United States or the Board of Governors of the Federal Reserve System, and 'benefits under an employee welfare plan' means one or more benefits or services under any plan established or maintained for employees or their families or dependents, or for both, including, but not limited to, medical, surgical or hospital care benefits; benefits in the event of sickness, accident, disability or death; benefits in the event of unemployment, or retirement benefits."

Although § 31-53 (h) has been amended by Public Acts 2003, No. 03-84, § 17, the changes are not relevant to this appeal. References herein to § 31-53 are to the 2003 revision of the General Statutes.

31-76c[5] and 31-76g.[6] The plaintiffs sought to recover, pursuant to General Statutes § 31-72,[7] double damages, costs and attorney's fees on the unpaid wages claims. The plaintiffs also alleged that the defendants had failed to post the current prevailing wage rates as required by General Statutes § 31-55.[8]

The plaintiffs also brought actions against the defendants for wrongful termination of the plaintiffs' employ-

---

[5] General Statutes § 31-76c provides: "No employer, except as otherwise provided herein, shall employ any of his employees for a workweek longer than forty hours, unless such employee receives remuneration for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

[6] General Statutes § 31-76g provides: "Extra compensation paid as described in subparagraphs (E), (F) and (G) of subdivision (1) of section 31-76b shall be creditable toward overtime compensation payable pursuant to sections 31-76b to 31-76j, inclusive."

[7] General Statutes § 31-72 provides: "When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, or fails to compensate an employee in accordance with section 31-76k or where an employee or a labor organization representing an employee institutes an action to enforce an arbitration award which requires an employer to make an employee whole or to make payments to an employee welfare fund, such employee or labor organization may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court, and any agreement between him and his employer for payment of wages other than as specified in said sections shall be no defense to such action. The Labor Commissioner may collect the full amount of any such unpaid wages, payments due to an employee welfare fund or such arbitration award, as well as interest calculated in accordance with the provisions of section 31-265 from the date the wages or payment should have been received, had payment been made in a timely manner. In addition, the Labor Commissioner may bring any legal action necessary to recover twice the full amount of unpaid wages, payments due to an employee welfare fund or arbitration award, and the employer shall be required to pay the costs and such reasonable attorney's fees as may be allowed by the court. The commissioner shall distribute any wages, arbitration awards or payments due to an employee welfare fund collected pursuant to this section to the appropriate person."

[8] General Statutes § 31-55 provides: "Every contractor or subcontractor performing work for the state subject to the provisions of section 31-53 or 31-54 shall post the prevailing wages as determined by the Labor Commissioner in prominent and easily accessible places at the site of work or at such place or places as are used to pay its employees their wages."

ment. These wrongful discharge actions alleged that the defendants violated General Statutes §§ 31-51m,[9] 31-51q[10]

---

[9] General Statutes § 31-51m provides: "(a) As used in this section and section 31-278:

"(1) 'Person' means one or more individuals, partnerships, associations, corporations, limited liability companies, business trusts, legal representatives or any organized group of persons;

"(2) 'Employer' means a person engaged in business who has employees, including the state and any political subdivision of the state;

"(3) 'Employee' means any person engaged in service to an employer in a business of his employer;

"(4) 'Public body' means (A) any public agency, as defined in subdivision (1) of section 1-200, or any employee, member or officer thereof, or (B) any federal agency or any employee, member or officer thereof.

"(b) No employer shall discharge, discipline or otherwise penalize any employee because the employee, or a person acting on behalf of the employee, reports, verbally or in writing, a violation or a suspected violation of any state or federal law or regulation or any municipal ordinance or regulation to a public body, or because an employee is requested by a public body to participate in an investigation, hearing or inquiry held by that public body, or a court action. No municipal employer shall discharge, discipline or otherwise penalize any employee because the employee, or a person acting on behalf of the employee, reports, verbally or in writing, to a public body concerning the unethical practices, mismanagement or abuse of authority by such employer. The provisions of this subsection shall not be applicable when the employee knows that such report is false.

"(c) Any employee who is discharged, disciplined or otherwise penalized by his employer in violation of the provisions of subsection (b) may, after exhausting all available administrative remedies, bring a civil action, within ninety days of the date of the final administrative determination or within ninety days of such violation, whichever is later, in the superior court for the judicial district where the violation is alleged to have occurred or where the employer has its principal office, for the reinstatement of his previous job, payment of back wages and reestablishment of employee benefits to which he would have otherwise been entitled if such violation had not occurred. An employee's recovery from any such action shall be limited to such items, provided the court may allow to the prevailing party his costs, together with reasonable attorney's fees to be taxed by the court. Any employee found to have knowingly made a false report shall be subject to disciplinary action by his employer up to and including dismissal.

"(d) This section shall not be construed to diminish or impair the rights of a person under any collective bargaining agreement."

[10] General Statutes § 31-51q provides: "Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States

and 31-69b.[11]

The defendants interposed the following special defenses: (1) that some or all of the plaintiffs' causes of action were barred by the applicable statute of limitations, General Statutes § 52-596;[12] (2) that the claims arising out of the UCONN project for three of the plaintiffs, William Berlepsch, Miro Tanski and Michael Gianelli, were barred by the doctrine of accord and satisfaction, and that those plaintiffs released the defen-

Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer."

[11] General Statutes § 31-69b provides: "(a) An employer shall not discharge, discipline, penalize or in any manner discriminate against any employee because the employee has filed a claim or instituted or caused to be instituted any investigation or proceeding under part III of chapter 557 or this chapter, or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by part III of chapter 557 or this chapter.

"(b) Any employee who believes that he has been discharged, disciplined, penalized or otherwise discriminated against by any person in violation of this section may file a complaint with the Labor Commissioner alleging violation of the provisions of subsection (a) of this section. Upon receipt of any such complaint, the commissioner shall hold a hearing. After the hearing, the commissioner shall send each party a written copy of his decision. The commissioner may award the employee all appropriate relief including rehiring or reinstatement to his previous job, payment of back wages and reestablishment of employee benefits to which he otherwise would have been eligible if he had not been discharged, disciplined, penalized or discriminated against. Any employee who prevails in such a complaint shall be awarded reasonable attorney's fees and costs. Any party aggrieved by the decision of the commissioner may appeal the decision to the Superior Court in accordance with the provisions of chapter 54."

[12] General Statutes § 52-596 provides: "No action for the payment of remuneration for employment payable periodically shall be brought but within two years after the right of action accrues, except that this limitation shall be tolled upon the filing with the Labor Commissioner of a complaint of failure to pay wages pursuant to the provisions of chapter 558."

dants from any liability for labor claims arising out of that project; and (3) that all of the plaintiffs' claims were barred because each plaintiff, prior to instituting the action, already had assigned his claim to the state department of labor (department). Lawrence Brunoli, Jr., and Lawrence Brunoli, Inc., also filed counterclaims against William Schoonmaker alleging malicious prosecution, defamation and intentional infliction of emotional distress.

A jury returned verdicts in favor of the six plaintiffs on their prevailing wage claims, and awarded them damages.[13] The jury also concluded that the defendants' failure to pay the plaintiffs the proper prevailing wages was a result of the defendants' bad faith, arbitrariness and unreasonableness. The jury returned verdicts in favor of the defendants on the plaintiffs' wrongful discharge claims. Finally, the jury returned verdicts for the plaintiffs on the defendants' counterclaims.[14]

Numerous postverdict motions followed. Both the plaintiffs and the defendants filed motions to set aside the verdict and for a new trial. The trial court also concluded that the plaintiffs' claims arising out of the Wolcott School project had been assigned by them to the department. Accordingly, the court substantially reduced the plaintiffs' verdicts by the amounts awarded for the Wolcott School claims. The court granted the plaintiffs' motions, pursuant to § 31-72, to double the verdicts and awarded them attorney's fees in the amount of $39,750. Finally, the court partially granted the defendants' motions for attorney's fees incurred in defending the plaintiffs' wrongful discharge claims. The court awarded the defendants $12,000 in attorney's fees.

On appeal, the plaintiffs claim that the trial court improperly: (1) concluded that the plaintiffs had

[13] See footnote 41 of this opinion.

[14] Lawrence Brunoli, Jr., subsequently withdrew the intentional infliction of emotional distress counterclaim.

assigned their claims arising out of the Wolcott School project to the department, thereby extinguishing their rights and interest in those claims; (2) determined when the plaintiffs' causes of action had accrued under, and the tolling of, the applicable statute of limitations, thereby resulting in an insufficient jury award; (3) refused to instruct the jury that, upon a finding that the defendants had violated § 31-53 (f) by failing to keep proper employee work and wage records, the burden of proof shifted to the defendants to disprove the plaintiffs' claims of lost wages; (4) concluded that there was no evidence to support the plaintiffs' wrongful discharge claims and, therefore, that the defendants were entitled to attorney's fees for the defense of those claims; (5) determined the amount of attorney's fees that were to be awarded to the defendants for defense of the wrongful discharge claims; (6) refused to award interest to the plaintiffs on the jury awards for their lost wages; and (7) reduced the amount of the attorney's fees that the plaintiffs were awarded.[15]

In their cross appeal, the defendants claim that the trial court improperly deviated from the plaintiffs' contingency fee agreement in its award of attorney's fees to the plaintiffs. The defendants also claim that the trial court improperly refused to set aside, pursuant to the doctrine of accord and satisfaction, the verdicts for Berlepsch, Tanski and Gianelli for claims arising out of the UCONN project.

Our resolution of the parties' various claims on appeal is set forth in far greater detail in the remainder of this opinion. To summarize, however, we conclude that with respect to the plaintiffs' claims on appeal: (1) the trial court improperly concluded that the plaintiffs had

[15] We do not reach this claim, however, because of our conclusion on the defendants' cross appeal that, in awarding attorney's fees to the plaintiffs, the trial court improperly had deviated from the contingency fee agreement between the plaintiffs and their attorneys. See part VI of this opinion.

assigned their claims arising out of the Wolcott School project to the department, because the language on the claim forms merely created an assignment for collection; (2) the record is inadequate to permit meaningful appellate review of the plaintiffs' statute of limitations claims; (3) although the trial court improperly instructed the jury on the applicable burden of proof upon a finding of a record keeping violation, that improper instruction was harmless error; (4) the trial court did not abuse its discretion in awarding the defendants $12,000 in attorney's fees for the defense of four of the plaintiffs' wrongful discharge claims that the court deemed were frivolous; and (5) the plaintiffs failed to preserve for appellate review the issue of whether the trial court improperly refused to award them interest on their jury awards for their unpaid wages.

With respect to the defendants' claims on their cross appeal, we conclude that the trial court: (1) abused its discretion and improperly deviated from the contingency fee agreement between the plaintiffs and their attorneys in awarding attorney's fees to the plaintiffs; and (2) correctly refused to set aside, pursuant to the doctrine of accord and satisfaction, the verdict for Berlepsch, Tanski and Gianelli for claims arising out of the UCONN project.

By way of background, we note that the jury reasonably could have found the following facts. Lawrence Brunoli, Inc., is a construction company licensed to do business in this state. Lawrence Brunoli, Jr., and Lawrence Brunoli, Sr., are directors and officers of the corporation, with the latter serving as vice president. The plaintiffs were employees of Lawrence Brunoli, Inc., and worked for the defendants on various public works construction projects, which included work at the Wolcott School, UCONN and the Cedarcrest Hospital. At these projects, the plaintiffs engaged in various

construction-related tasks, including, but not limited to, heavy equipment operation, masonry and tinsmithing. During the course of the plaintiffs' employment in the mid-1990s, complaints surfaced that the defendants were not properly compensating their workers, including the plaintiffs, in accordance with the prevailing wage requirements of § 31-53 (b). These complaints were investigated by both the Foundation for Fair Contracting in Connecticut (foundation), a private organization, and the department, eventually giving rise to the present action. Additional relevant facts and procedural history will be set forth, with specificity, in the context of the appropriate claim on appeal.

I

ASSIGNMENT OF THE PLAINTIFFS' CLAIMS
TO THE DEPARTMENT

The first issue in this appeal is whether the trial court improperly concluded that certain language on the department complaint forms constituted a valid and complete assignment of the Wolcott School claims to the department, thereby extinguishing the plaintiffs' right, title and interest in those claims, in the absence of a reassignment of those claims to the plaintiffs. The plaintiffs claim that the language on the forms was merely an assignment for collection that did not completely extinguish their interest in those claims. The defendants claim that the trial court properly concluded that the language on the forms was a complete assignment of the Wolcott School claims.

The record reveals the following additional facts and procedural history necessary for the resolution of this claim. The plaintiffs,[16] in December, 1995, and January, 1996, filed with the department standard complaint forms entitled "statement of claim for wages." These

---

[16] Gianelli did not file a claim arising from the Wolcott School project.

complaint forms, which were admitted into evidence at trial, alleged nonpayment of prevailing wages and overtime pay at the Wolcott School project. The language at issue is located on the reverse side of the forms, above the claimant's signature, and provides: "I hereby assign all wages and all penalties accruing because of their non-payment, and all liens securing them to the Labor Commissioner of the State of Connecticut *to collect* in accordance with the law." (Emphasis added.) Gary Pechie, director of the department's wage and workplace standards division, testified about the contents of the form. He testified that the form submitted by the plaintiffs had been last revised in 1994. Pechie testified that the language at issue authorized the department to pursue unpaid wages on behalf of the signatory claimants.[17] Daniel Jackson, a wage enforcement agent for the department, testified that the department terminates its investigative and collection efforts when the employee who filed the complaint form subsequently initiates a separate civil action.

The defendants moved to set aside or reduce the plaintiffs' verdicts by the amount awarded for the Wolcott School claims. In response to this motion, the trial court concluded, as a matter of law, that "the effect of the assignments of the plaintiffs to their rights under the [Wolcott School] job to the [department] had the effect, as with all assignments, of transferring to the assignee exclusive ownership of all the assignor's rights, actually to the subject assigned and extinguished all of these rights in the assignor." The court discounted Jackson's testimony that collection efforts stop when a private action is begun, and noted that the plaintiffs never pursued a reassignment of those claims from the

---

[17] Pechie stated that if a claim was found to be meritorious by the department, it would attempt recovery by itself. If the department's collection efforts were unsuccessful, it would refer the case to the attorney general for collection.

department.[18] Accordingly, the trial court granted the defendants' motion and substantially reduced the verdicts by the amounts that the jury had awarded for the Wolcott School claims.[19]

The plaintiffs claim that the assignment language is merely an assignment for collection that does not deprive them of the right to bring a civil action against their employer. The plaintiffs also claim that the assignment language on the form is superfluous and, therefore, legally meaningless because they brought this action pursuant to § 31-72, which expressly allows the department to act on behalf of an employee without a formal assignment of claim.[20] The defendants contend that in the absence of a formal reassignment of claims from the department to the plaintiffs, the assignment language completely extinguished the plaintiffs' interest

[18] Indeed, the trial court noted, early in the trial during the testimony of Sandra Barrachina, a department field supervisor, its concern that the assignment language might still be in effect, regardless of the department policy of ceasing investigative action when a private action is filed on the matter.

[19] Specifically, the plaintiffs' awards were reduced as follows: Scheller, to $0 from $3867; Tanski, to $1497 from $12,506; Schoonmaker, to $116 from $23,576; Berlepsch, to $4983 from $16,081; and Blejewski, to $0 from $14,892.

[20] Our resolution of the plaintiffs' claim on appeal is grounded in an analysis of the form's specific assignment language. We, therefore, will not address the plaintiffs' claim that the assignment language on the form is superfluous and legally meaningless because they brought this action pursuant to § 31-72.

We would be remiss, however, if we did not briefly discuss the relevant statutory framework within which the plaintiffs' claim arises. Under § 31-72, either an employee, a labor organization or the commissioner of the department may bring an action necessary to recover twice the full amount of unpaid wages, with costs and reasonable attorney's fees. The department may act on behalf of an employee without a formal assignment of claim. See General Statutes § 31-72; see also Public Acts 1989, No. 89-157, § 2. We note, however, that § 31-72 is silent about the effect of subsequent assignments of claims to the department, and that the parties dispute the legal effect of the statute on the validity of the form's assignment language. In light of our conclusion, however, that the assignment language is merely that of an assignment for collection, which does not preclude the plaintiffs from bringing their own claims arising out of the Wolcott School project, we need not resolve this statutory dispute.

in their Wolcott School claims. The defendants also claim that not requiring a formal reassignment of claims potentially could result in duplicate liability for employers. We agree with the plaintiffs and conclude that the language on the form merely creates an assignment for collection.

We first set forth the appropriate standard of review. "An assignment is a contract between the assignor and the assignee, and is interpreted or construed according to rules of contract construction." 6 Am. Jur. 2d 153, Assignments § 1 (1999). The parties do not dispute that interpretation of the form's language presents a question of law over which we exercise plenary review. "[W]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . [B]ecause the trial court relied solely upon the written agreements in ascertaining the intent of the parties, the legal inferences properly to be drawn from the documents are questions of law, rather than fact." (Citation omitted; internal quotation marks omitted.) *Gateway Co.* v. *DiNoia*, 232 Conn. 223, 229–30, 654 A.2d 342 (1995).

"Generally, to constitute an assignment there must be a purpose to assign or transfer the whole or a part of some particular thing, debt, or chose in action, and the subject matter of the assignment must be described with such particularity as to render it capable of identification." (Internal quotation marks omitted.) *Dysart Corp.* v. *Seaboard Surety Co.*, 240 Conn. 10, 17, 688 A.2d 306 (1997). The right to bring an action to collect a debt, such as unpaid wages, is a chose in action. See *Bouchard* v. *People's Bank*, 219 Conn. 465, 472, 594 A.2d 1 (1991) ("[s]ince the commonest type of right subject to assignment is one for the payment of money . . . the plaintiff sued the defendant on a validly assignable chose in action" [citation omitted; internal quotation marks omitted]); Black's Law Dictionary (7th Ed.

1999) (chose in action is "[t]he right to bring an action to recover a debt, money, or thing"). Under the hornbook law of assignments, "[t]he assignee of a chose in action stands in the shoes of the assignor." *Mall* v. *LaBow*, 33 Conn. App. 359, 362, 635 A.2d 871 (1993), cert. denied, 229 Conn. 912, 642 A.2d 1208 (1994). Indeed, "[s]uccession by an assignee to exclusive ownership of all or part of the assignor's rights respecting the subject matter of the assignment, and a corresponding extinguishment of those rights in the assignor, is precisely the effect of a valid assignment." *Bouchard* v. *People's Bank*, supra, 473. We note, however, that, under the doctrine of assignment for collection, the assignor *does* in fact retain an equitable ownership, and therefore, substantial rights, in the action assigned. See, e.g., 6 Am. Jur. 2d 259, supra, §§ 177 through 178.

In *DeBenedictis* v. *Hagen*, 77 Wash. App. 284, 289–90, 890 P.2d 529 (1995), the Washington Court of Appeals articulated a particularly illuminating analysis of the distinction between an assignment for collection and a complete assignment: "To analyze this claim, we distinguish between two kinds of assignments. On the one hand, a creditor/assignor can assign his or her claim against a debtor in such a way as to effect a complete sale of the claim. An example is the business that sells a group of accounts receivable; frequently, it will convey its entire ownership interest in exchange for a cash payment. . . .

"On the other hand, a creditor/assignor can assign his or her claim against a debtor for purposes of collection. Such an assignment transfers legal title to the claim, so the assignee can sue in his or her own name. . . . [T]his leaves equitable ownership with the creditor/assignor. . . . The resultant split in ownership gives rise to a fiduciary relationship between the assignor and assignee . . . and the relationship generally is one of principal-agent. . . . Subject to exceptions not per-

tinent here, the principal can revoke the agent's authority at any time . . . ." (Citations omitted.) Accord *Robinson* v. *Kamens*, 664 F. Sup. 118, 120 (S.D.N.Y. 1987); *Robertson* v. *Robertson*, 231 Ark. 573, 575, 331 S.W.2d 102 (1960); *Eagle* v. *Allen*, Hawaii Court of Appeals, Docket No. 22950 (August 21, 2001), aff'd, 96 Haw. 386, 31 P.3d 243 (2001); *Garren* v. *Saccomanno*, 86 Idaho 268, 275, 385 P.2d 396 (1963).

We conclude that the assignment language at issue in the present case created an assignment for collection, rather than a complete assignment. The plaintiffs, therefore, retained equitable ownership of those claims, and may bring an action to collect the wages owed them. We rest our conclusion on the plain language of the relevant provision of the department's complaint form, which stated specifically that the claimant's wages and penalties are being assigned for the department "to *collect* in accordance with the law." (Emphasis added.) Our conclusion finds further support in surrounding provisions of the complaint form, which expressly "authorize" the department to settle the claims, or transfer or assign them as necessary for settlement. The assignor retains express authority to object to, or disapprove, any proposed settlement. We note that this language of assignment creates, under well established Connecticut law, what is essentially an agency relationship[21] between the complainant and the department, a legal status that is a hallmark of the assignment for collection. See *DeBenedictis* v. *Hagen*, supra, 77 Wash. App. 290. Furthermore, to construe this assignment other than as an assignment for collection, would make little practical sense. It necessarily would mean that the

---

[21] "[T]he three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." (Internal quotation marks omitted.) *Hallas* v. *Boehmke & Dobosz, Inc.*, 239 Conn. 658, 673, 686 A.2d 491 (1997).

state, in the form of the department, would be entitled to collect, and *keep*, the plaintiffs' wages due. It is difficult to conceive why the plaintiffs would assign, and the state would be entitled to, unpaid wages that were the result of the plaintiffs' labor, not of any agent of the state. We conclude, therefore, that the language of assignment merely created an assignment for collection, and that the plaintiffs retained equitable ownership of the Wolcott School claims, a status that permitted them to maintain the present action.

The defendants contend that a reassignment from the department to the plaintiffs remained necessary because of the risk of duplicate liability, should both an employee and the department pursue claims simultaneously. We disagree with this claim for several reasons.[22] First, under res judicata principles, when an "assignment is for collection only, the assignor and assignee are in privity" with each other. *Gwynn* v. *Wilhelm*, 226 Ore. 606, 609, 360 P.2d 312 (1961). Accordingly, the department cannot litigate the same claim against the same defendant employer if an employee already has recovered a final judgment on that particular claim, and vice versa. See *Personnel One* v. *Som-*

---

[22] We do note, however, our disagreement with the plaintiffs' contention that the prior pending action doctrine operates to shield employers from the duplicate liability feared by the defendants. Under the prior pending action doctrine, "[t]he pendency of a prior suit of the same character, between the same parties, brought to obtain the same end or object, is, at common law, good cause for abatement. . . . This is a rule of justice and equity, generally applicable, and always, where the two suits are virtually alike, and in the same jurisdiction." (Internal quotation marks omitted.) *Cumberland Farms, Inc.* v. *Groton*, 247 Conn. 196, 216, 719 A.2d 465 (1998). A court applying the prior pending action doctrine "must examine the pleadings to ascertain whether the actions are virtually alike . . . and whether they are brought to adjudicate the same underlying rights." Id. (Citation omitted; internal quotation marks omitted.) The prior pending action doctrine would not apply to shield employers from the duplicate liability feared by the defendants because the plaintiffs would be different; one action would be brought by the employees, while the other would be brought by the department.

*merer & Co.*, 564 So. 2d 1217, 1218 (Fla. App. 1990) (subsequent action by assignor barred by res judicata when assignee of accounts receivable brought unsuccessful action in first instance); see also *Gribben* v. *Lucky Star Ranch Corp.*, 623 F. Sup. 952, 960 (W.D. Mo. 1985) ("[a] privity relationship for res judicata purposes exists when the interests of a non-party are represented by a party in the former action"); *Gwynn* v. *Wilhelm*, supra, 610 (default judgment against patient in physician's action to collect fees does not bar patient's malpractice action against physician). Second, the department's policy is to discontinue its collection efforts upon the filing of a private action by the employee. It is, therefore, unlikely that, as a practical matter, there would be two actions; indeed, no such thing occurred here.[23] We conclude, therefore, that the trial court improperly determined that, as a result of the assignment language on the department's claim form, the plaintiffs had extinguished their interest in the Wolcott School claims. Accordingly, the trial court improperly granted the defendants' motion to set aside or reduce the plaintiffs' verdicts by the amount the jury had awarded for the Wolcott School claims.

## II

### STATUTE OF LIMITATIONS CLAIMS

The plaintiffs next claim that the trial court improperly determined the date when certain causes of action

---

[23] Mindful that this concern arises under the statutory framework of § 31-72, we note that the legislature contemplated the possibility of duplicate liability when it enacted Public Acts 1989, No. 89-157. In House debate, Representative Richard O. Belden asked: "[C]an the individual who is aggrieved get two bites of the apple, one through the commissioner . . . and can they also go to court to the employer through another mechanism . . . ?" 32 H.R. Proc., Pt. 15, 1989 Sess., pp. 5203–5204. Representative Joseph A. Adamo, house chairman of the joint standing committee on labor and public employees, replied: "Either one or the other can do it, *not both* . . . ." (Emphasis added.) Id., p. 5204; see also footnote 20 of this opinion.

had accrued under § 52-596, the applicable statute of limitations. See footnote 12 of this opinion. The plaintiffs also claim that because the trial court improperly concluded that an anonymous letter filed with the department would not toll the statute of limitations, the court excluded from the evidence an anonymous handwritten note to the department. The defendants contend, in response, that the plaintiffs' claims are not properly before this court because the plaintiffs' briefs fail to relate the claims to a particular trial court ruling on the statute of limitations issue. We conclude that the record is inadequate to allow for proper appellate review of the plaintiffs' statute of limitations claims.

It is well established that "[i]t is the appellant's burden to provide an adequate record for review. . . . It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . to clarify the legal basis of a ruling . . . or to ask the trial judge to rule on an overlooked matter. . . . In the absence of any such attempts, we decline to review this issue." (Citations omitted; internal quotation marks omitted.) *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 674–75, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001); see also Practice Book §§ 60-5 and 66-5.

In the present case, the trial court record is inadequate to permit any meaningful review of the plaintiffs' statute of limitations claims. The plaintiffs raised various statute of limitations claims, in their motions for additur and to set aside the verdict, and they repeated them at oral argument before the trial court. Specifically, the plaintiffs claimed that the trial court improperly determined the dates on which the plaintiffs' causes of action had accrued, as well as the dates on which the statute of limitations was tolled. We note, however,

that the record is silent with respect to the trial court's treatment of these specific claims. The draft judgment file contains only a general denial of the plaintiffs' motions, and the trial court did not discuss the statute of limitations issues in rendering its oral decision. This leaves us with the inappropriate task of speculating about the trial court's reasoning, and the effect of its decision on the claims of each individual plaintiff. The plaintiffs' principal and reply briefs confirm our analysis; while they are replete with legal arguments pertaining to the statute of limitations, neither brief directs our attention to a definitive trial court ruling with respect to any of the particular claims in the plaintiffs' complaint.[24] Furthermore, the record indicates that the plaintiffs never remedied this defect in the record by moving for articulation or rectification of the trial court's decision. Accordingly, we decline to engage in a speculative review of the trial court's decision.

## III

## JURY INSTRUCTIONS ON THE BURDEN OF PROOF ON THE AMOUNT OF LOST WAGES

The plaintiffs, relying on *Anderson* v. *Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946), claim that the trial court improperly refused to instruct the jury that, upon a finding that the defendants had failed to keep records required by § 31-53 (f),[25] the burden of proof shifted to the defendants,

---

[24] We do note that the trial court ruled during the trial that an anonymous handwritten note is insufficient, as a matter of law, to toll § 52-596. Accordingly, even after the note was authenticated by its author, Tanski, the trial court refused to admit it into evidence as not relevant. In their principal and reply briefs, however, the plaintiffs fail to relate their legal discussion to the disposition of specific claims in the trial court. We, therefore, are left with no indication of what practical relief would be afforded to each of the plaintiffs should we rule in their favor on these claims. Accordingly, we decline to address them.

[25] See footnote 4 of this opinion for the text of § 31-53 (f).

requiring them to disprove the plaintiffs' claims for wages. The defendants, in addition to claiming that the burden shifting scheme of *Anderson* is factually and legally inappropriate for the present case, contend that the trial court's charge accurately reflected the safe harbor that Connecticut law provides for litigants who are, because of the circumstances of their case, unable to prove their damages with precision and certainty. We agree with the plaintiffs, and we conclude that the trial court should have charged the jury in accordance with the burden shifting scheme articulated in *Anderson v. Mt. Clemens Pottery Co.*, supra, 687–88. We also conclude, however, that this instructional impropriety was harmless because it was not likely to have affected the jury's verdict.

The record reveals the following additional facts and procedural history relevant to the disposition of this claim. Sandra Barrachina, the department field supervisor, testified that when she had investigated complaints against the defendants arising from the Wolcott School project, the defendants had submitted incomplete records to her. These records included log books kept by both the defendants and the department of public works. Barrachina testified that, in the opinion of the department, the certified payroll statement that the defendants had submitted did not meet the requirements of § 31-53 (f) because it was submitted with inconsistencies, in the incorrect form, and without the required statement of compliance. She also testified that the defendants had failed to comply with her request for a correct certified payroll, which was made after an audit of the defendants by the department.

Each of the plaintiffs testified regarding the amount of money that he was owed by the defendants for each project in question. Tanski testified that he was owed $6352 for his work at the UCONN project, and $19,800 for the Wolcott School project. Tanski testified that he

had derived those figures by examining his paycheck stubs for the UCONN project, and the Lawrence Brunoli, Inc., and department of public works log books for the Wolcott School project, as well as personal notes that he had kept of his duties at work. He then compared those documents and his notes to the prevailing wage schedule, classifying himself as a carpenter or laborer to complete any classification gaps.[26]

The remaining plaintiffs used substantially similar methodology to arrive at their individual damage figures. Gerry Blejewski testified that he was owed $25,380.18 for his work at the Wolcott School project. Gianelli testified that he was owed $3781 for his work at the Cedarcrest Hospital and the UCONN projects. Richard M. Scheller, Jr., testified that he was owed $2200 for his work at the Cedarcrest Hospital project, and $13,500 for his work at the UCONN project. Schoonmaker testified with great specificity about his hours and tasks, ultimately concluding that he was owed $300 for his work at the UCONN project, and $19,891.78 for his work at the Wolcott School project. Finally, Berlepsch testified that he was owed $5960 for his work at the UCONN project, and approximately $32,800 for his work at the Wolcott School project. The documents that the plaintiffs used to calculate their unpaid wages were all admitted into evidence.

Subsequently, the defendants cross-examined the plaintiffs about the calculations and methodology that they had used in arriving at their claims of unpaid wages.[27] The defendants also presented affirmative doc-

[26] The individual job classifications are significant because they determine the employee's rate of pay for his labor on a particular project. For example, at the UCONN project, an employee performing the tasks of a laborer received $16 per hour in base pay, but an employee acting as a carpenter would receive $18.50 per hour in base pay.

[27] Indeed, the defendants had elicited testimony from Gianelli that he was, in fact, *overpaid* for the tasks that he actually performed on the Cedarcrest Hospital project. The defendants also elicited testimony from Scheller about discrepancies in his testimony and calculations about the nature of the

umentary and testimonial evidence. For example,[28] Tama Brunoli, the defendants' treasurer, testified on their behalf. She was responsible for the defendants' payroll in 1994 and 1995. During her testimony, the defendants introduced into evidence a computer generated report used for job classification (payroll report), which contained entries describing the number of hours worked by the defendants' employees, including the plaintiffs, and the cost of each hour of work.[29] The defendants also introduced into evidence the W-2 forms describing the plaintiffs' base pay, and the 1099 forms that described the plaintiffs' fringe benefits packages. This information also was contained in the payroll report.[30]

The payroll report, as described by Tama Brunoli, contained the total amount of hours worked by each plaintiff on each specific job, including the amount of straight time and overtime hours worked in each specific job classification of laborer, machine operator and carpenter, and the compensation for that labor.[31] The

work, and the number of hours, applicable to his UCONN and Cedarcrest Hospital claims. The jury did not award any damages to Gianelli for his Cedarcrest Hospital claims, or to Scheller for his UCONN and Cedarcrest Hospital claims.

[28] We also note that the defendants introduced into evidence a revised notice from the department of unpaid wages due to the plaintiffs. This notice encompassed the claims arising out of the UCONN project and also suggested numerous amounts due to each individual plaintiff.

[29] Tama Brunoli testified on cross-examination that the payroll report had not been submitted to the defendants' attorney during the initial department investigation.

[30] Tama Brunoli testified that because the W-2 hours were calculated weekly, and the 1099 hours on a monthly basis, the W-2 hours provided the most accurate figure for determining the number of hours worked by an individual employee on any given project.

[31] Tama Brunoli did testify on cross-examination, however, that the payroll report was not broken down to include more specific classifications beyond laborer, operator or carpenter. Such specific classifications would include iron and tin sheet metal work. The payroll report also did not indicate specifically the prevailing wage rate for a particular job classification. The prevailing wage rates for each classification at each job, however, were also introduced into evidence during the trial. We do note, however, that Tama

payroll report also included information on bonuses paid to the plaintiffs for hours not actually worked, such as during the holiday season. The information in the payroll report was compiled by Tama Brunoli with information gleaned from Lawrence Brunoli, Jr.,[32] who reported the applicable prevailing wages, and reports by the defendants' field supervisor about the plaintiffs' work hours in each job classification. The plaintiffs then cross-examined Tama Brunoli at length about the methodology that she had used in creating the payroll report, and omissions or discrepancies contained therein.

The plaintiffs submitted to the trial court a written request to charge that incorporated language from *Anderson* v. *Mt. Clemens Pottery Co.*, supra, 328 U.S. 687–88, stating that upon proof of improper record keeping by an employer, coupled with "sufficient evidence to show the amount and extent of [the employee's] work as a matter of just and reasonable inference . . . the burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negat[e] the reasonableness of the inference to be drawn from the employees' evidence."[33] The trial court declined to adopt the plain-

Brunoli testified that the equipment operator rate on the payroll report is the highest operator rate on any of the defendants' job sites, regardless of the specific equipment being operated.

[32] Lawrence Brunoli, Jr., current president of Lawrence Brunoli, Inc., and project manager of the Wolcott School project in 1994–95, also testified. He testified that Berlepsch was the primary equipment operator, and devoted approximately 50 percent of his time to equipment operation, with the remainder of his time spent on carpentry, demolition and sheetrocking. Lawrence Brunoli, Jr., also testified that Schoonmaker operated equipment for approximately 10 percent of his time at the Wolcott School project, with the remainder spent on concrete work and demolition.

[33] Specifically, the plaintiffs' request to charge provided: "As I have already instructed you, [§ 31-53 (f)] requires each employer to keep, maintain and preserve records relating to the hours worked and work classifications of each employee. Due regard must be given that [it] is the employer's and not the employees' duty to keep and maintain these records. If the employe[r] has kept inadequate records and the employee produces sufficient evidence

tiffs' proffered burden shifting language, and instead instructed the jury as follows: "So if you do find that the records kept by the employer, the . . . defendants, if you find those records were inadequate and the employee does produce sufficient evidence to show the amount or type of work for which an employee was not properly compensated as a matter of logical and reasonable inferences, then you can consider [that] in deciding whether the employee has convinced you by a preponderance of the evidence of the amount of damages sustained by him. The situation with respect to the records—you still, of course, have to be convinced by a preponderance of the evidence as to the amount of damage proximately caused by the failure to pay wages, if you find that there was a failure to pay wages."[34] The plaintiffs then took a postcharge exception to the trial court's exclusion of the burden shifting language. The plaintiffs also relied on their objections to the charge in their motions for additur and to set aside the verdict, both of which the trial court denied after oral argument.

"Our analysis begins with a well established standard of review. When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety,

---

to show the amount or type of work for which an employee was not properly compensated as a matter of just reasonable inference, the employe[r] cannot complain that the damages allowed the employee lacked the exactness of measurement that would be possible had the employer kept the required records. Where the employee has produced such sufficient evidence to show the amount and extent of his work as a matter of just and reasonable inference, the burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to [negate] the reasonableness of the inference of the employees' evidence, even though it is approximate."

[34] The trial court prefaced this instruction by instructing the jury about the employer's record keeping duties under § 31-53 (f), and explaining that the adequacy of the defendants' records was a question of fact for the jury to resolve.

read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . We do not critically dissect a jury instruction." (Citation omitted; internal quotation marks omitted.) *Ancheff* v. *Hartford Hospital*, 260 Conn. 785, 811, 799 A.2d 1067 (2002).

We conclude that the trial court's instruction to the jury was improper because it did not incorporate the burden shifting principles of *Anderson* v. *Mt. Clemens Pottery Co.*, supra, 328 U.S. 687–88. We begin our analysis of the plaintiffs' claim by parsing the decision in *Anderson* v. *Mt. Clemens Pottery Co.*, supra, 687, wherein the United States Supreme Court addressed the "proper and fair standard . . . for the employee to meet in carrying out his burden of proof," when the employer has failed to comply with the record keeping provisions of the Fair Labor Standards Act. The court concluded: "When the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes, a more difficult problem arises. . . . In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount

of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." Id., 687–88.

In articulating this burden shifting standard, the court recognized that employees bringing an action under Fair Labor Standards Act for unpaid wages, overtime compensation and liquidated damages bear the burden of proving that they "performed work for which [they were] not properly compensated. The remedial nature of this statute and the great public policy which it embodies, however, militate against making that burden an impossible hurdle for the employee. Due regard must be given to the fact that it is the employer who has the duty under . . . the [Fair Labor Standards] Act to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed. Employees seldom keep such records themselves; even if they do, the records may be and frequently are untrustworthy."[35] Id., 687.

We note that § 31-72, the state wage collection statute, is like the Fair Labor Standards Act, a remedial statute that is entitled to liberal construction. *Tianti* v. *William Raveis Real Estate, Inc.*, 231 Conn. 690, 696, 651 A.2d 1286 (1995); see also *Butler* v. *Hartford Tech-*

---

[35] The court also noted: "The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act." *Anderson* v. *Mt. Clemens Pottery Co.*, supra, 328 U.S. 687.

*nical Institute, Inc.*, 243 Conn. 454, 463, 704 A.2d 222 (1997). Accordingly, we find persuasive the plaintiffs' contention that, when an employer has failed to comply with statutory record keeping provisions, the failure to implement the *Anderson* burden shift has the potential to interfere with the remedial purpose of § 31-72, because any uncertainty in the damages amount is the fault of the employer. We do note, however, that *Anderson* merely imposes a shift in the burden of production, and not the burden of persuasion;[36] the ultimate burden of persuading the trier of fact remains with the employee. *Anderson* v. *Mt. Clemens Pottery Co.*, supra, 328 U.S. 686–87.

The defendants contend that the trial court's jury charge reflects the well established proposition that Connecticut law does not require a party claiming damages to prove them with exactitude or precision. Indeed, a party seeking damages must only "afford a basis for a reasonable estimate by the trier, court or jury, of the amount of that [party's] loss. From the very nature of the situation, the amount of loss cannot be proved with exactitude and all that can be required is that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation which will enable the trier to make a fair and reasonable estimate." (Internal quotation marks omitted.) *Stern & Co.* v. *International Harvester Co.*, 146 Conn. 42, 45–46, 147 A.2d 490 (1958)

---

[36] We explored the well established distinction between the "burden of production" and the "burden of persuasion" in *Potter* v. *Chicago Pneumatic Tool Co.*, 241 Conn. 199, 235 n.26, 694 A.2d 1319 (1997). In *Potter*, we noted that: "The phrase burden of proof is used in two ways. First, to refer to the burden of persuading the jury that a fact exists, and second, to refer to the burden of producing sufficient evidence to persuade the judge to allow the case or issue to go to the jury, viz., that a prima facie case exists. . . . The burden of *persuasion* creates a risk of an adverse decision on the merits by the jury, whereas the *burden of going forward or producing* evidence creates a risk that the judge will withdraw the case or an issue from the jury." (Citations omitted; emphasis added; internal quotation marks omitted.) Id.

(compensation for damages to business good will).[37] We agree that this existing Connecticut law governing litigants' proof of damages is consistent with the language and underlying policy of the *Anderson* burden shifting formulation. That consistency, however, does not render the instruction substantively correct, but is a factor that supports the improper charge's harmlessness, as further discussed later in this opinion.

We also note the defendants' claim, based on the plaintiffs' detailed computations and testimony about the wages owed to them, that the factual predicate of nonexistent records, which is required to trigger the *Anderson* burden shift, does not exist in the present case. The defendants contend that the *Anderson* formulation is intended to protect plaintiffs who, through no fault of their own, cannot testify with certainty about their alleged damages; accordingly, the plaintiffs in the present case were not "burdened by the handicap" that would trigger the application of *Anderson*. While the defendants identify correctly the policy that underlies *Anderson*, we note, however, that the record keeping requirements focus on the accuracy of records, as well as their completeness, because "without accurate records, there can be no assurance that the employees are receiving proper payment under § 31-53." *Electrical Contractors, Inc.* v. *Tianti*, 223 Conn. 573, 593, 613 A.2d 281 (1992). Accordingly, under our reading of *Anderson*, the burden shift is triggered by the *defendants'* conduct with respect to the required record keeping; the plaintiffs' detailed testimony assisted them in establishing

---

[37] Accord *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 65, 717 A.2d 77 (1998) (compensation for damages caused by installation of defective dryer vents); *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, 193 Conn. 208, 226 n.22, 477 A.2d 988 (1984) (evidence on record insufficient to justify award of consequential damages for conversion); *Rejouis* v. *Greenwich Taxi, Inc.*, 57 Conn. App. 778, 784–86, 750 A.2d 501 (compensation, under employment contract, for work-related death), cert. denied, 254 Conn. 906, 755 A.2d 882 (2000).

their prima facie cases, but does not deprive them of the benefit of the *Anderson* burden shift. We, therefore, conclude that the trial court's refusal to incorporate the *Anderson* burden shift into the jury instructions was improper.

Having concluded that the trial court improperly refused to incorporate the *Anderson* burden shift into its jury instructions, we next must determine whether this omission constituted harmful error. The plaintiffs contend that they were harmed by the improper instruction and, therefore, that they are entitled to a new trial because "[i]f the jury had been made aware of the shifting of the burden of proof to [the] [d]efendants, its determination of damages would have been based on a legal standard more favorable to the [p]laintiffs and their claims." We disagree with the plaintiffs' claim, and we conclude that the improper instruction was harmless error.

We begin our analysis by noting that "[i]t is axiomatic [however] that not every error is harmful. . . . [W]e have often stated that before a party is entitled to a new trial . . . he or she has the burden of demonstrating that the error was harmful. . . . An instructional impropriety is harmful if it is likely that it affected the verdict." (Citations omitted; internal quotation marks omitted.) *Scanlon* v. *Connecticut Light & Power Co.*, 258 Conn. 436, 448, 782 A.2d 87 (2001); accord *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.*, 254 Conn. 131, 145, 757 A.2d 516 (2000); *Remington* v. *Aetna Casualty & Surety Co.*, 240 Conn. 309, 316, 692 A.2d 399 (1997). In determining whether the improper instruction in the present case was likely to have affected the jury's verdict, we consider the factors set forth in the California Supreme Court's opinion in *Rutherford* v. *Owens-Illinois, Inc.*, 16 Cal. 4th 953, 983, 941 P.2d 1203, 67 Cal. Rptr. 2d 16 (1997). In *Rutherford*, the California court considered several factors in determin-

ing whether the giving of an improper burden shifting instruction was harmful error in that case, noting that "[t]he reviewing court should consider not only the nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury, but the likelihood of actual prejudice as reflected in the individual trial record, taking into account (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (Internal quotation marks omitted.) Id. We also find especially instructive the Appellate Court's recent opinion in *Barrett* v. *Hebrew Home & Hospital, Inc.*, 73 Conn. App. 327, 337, 807 A.2d 1075 (2002).

In *Barrett*, the plaintiff brought an action alleging that she was discharged from her employment in violation of General Statutes § 31-290a because she had exercised her rights to workers' compensation benefits prior to her discharge. Id., 328–29. The trial court had rendered judgment in accordance with the jury's verdict for her employer, and the plaintiff appealed claiming certain instructional improprieties. Id., 329. The plaintiff contended that the trial court improperly had instructed the jury about the three step, burden shifting analysis that this court had adopted in *Ford* v. *Blue Cross & Blue Shield of Connecticut, Inc.*, 216 Conn. 40, 53–54, 578 A.2d 1054 (1990), which is applicable in actions brought under § 31-290a.[38] *Barrett* v. *Hebrew Home &*

---

[38] In *Ford* v. *Blue Cross & Blue Shield of Connecticut, Inc.*, supra, 216 Conn. 53–54, this court adopted the well established employment discrimination burden shifting analysis of *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 804–805, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), for use in § 31-290a wrongful discharge cases. Under that analysis, "[t]he plaintiff bears the initial burden of *proving by the preponderance of the evidence a prima facie case* of discrimination. . . . In order to meet this burden, the plaintiff must present evidence that gives rise to an inference of unlawful discrimination. . . . If the plaintiff meets this initial burden, the burden then shifts to the defendant to rebut the presumption of discrimination by *producing* evidence of a legitimate, nondiscriminatory reason for its actions. . . . If the defendant carries this burden of production, the presumption raised by the prima

*Hospital, Inc.*, supra, 73 Conn. App. 331. She specifi-
cally claimed that the trial court improperly directed an
affirmative answer as to the second step of the analysis,
which is whether the defendant had *produced* any non-
retaliatory reason for discharging the plaintiff. Id., 336.
The Appellate Court concluded that this was harmless
error because "[p]ursuant to the *Ford* test, if the plaintiff
presents evidence that gives rise to a reasonable infer-
ence that her discharge was in retaliation for exercising
workers' compensation rights, the burden of *produc-
tion, not proof,* shifts to the defendant to rebut that
presumption by providing evidence of a legitimate rea-
son for terminating the plaintiff's employment. It is clear
from the record that the defendant offered evidence
of nonretaliatory reasons for the plaintiff's discharge.
Consequently, the defendant met and satisfied its bur-
den of production and, therefore, the court's direction
to the jury regarding the second interrogatory was
harmless under the facts of this case."[39] (Emphasis
added.) Id., 337.

We view the Appellate Court's analysis in *Barrett* v.
*Hebrew Home & Hospital, Inc.*, supra, 73 Conn. App.
337, as a paradigmatic example of how an improper
instruction on a party's burden of production generally
is less likely to affect the jury's verdict. The court in
*Barrett* recognized that, in the scheme of the overall
burden of proof, the burden of production has a lesser
impact on the fact-finding process than the burden of
persuasion. See footnote 36 of this opinion. Indeed, the

facie case is rebutted, and the factual inquiry proceeds to a new level of
specificity." (Citations omitted; emphasis added; internal quotation marks
omitted.) *Ford* v. *Blue Cross & Blue Shield of Connecticut, Inc.*, supra, 53–54.

[39] The Appellate Court also noted that "[m]ore significant . . . is the fact
that the jury determined pursuant to its answer to the first interrogatory
that the plaintiff had failed to make out a prima facie case and, thus, the
jury never would have reached the second interrogatory, save for the fact
that the court directed the answer to that interrogatory." *Barrett* v. *Hebrew
Home & Hospital, Inc.*, supra, 73 Conn. App. 337.

Appellate Court emphasized in *Barrett* that the defendant's only responsibility was to produce evidence; accordingly, the plaintiff in that case was not harmed by the trial court's direction of an affirmative answer to that question because the defendant had introduced *some* evidence. *Barrett* v. *Hebrew Home & Hospital, Inc.*, supra, 337.

Having reviewed the record in the present case, we conclude that in light of *Barrett* v. *Hebrew Home & Hospital, Inc.*, supra, 73 Conn. App. 337, and the factors delineated in *Rutherford* v. *Owens-Illinois, Inc.*, supra, 16 Cal. 4th 983, the improper instruction was not likely to have affected the jury's verdict here. Although the trial court did not expressly charge that a shift to the defendants of the burden of production was required, the record indicates that the *Anderson* sequence of proofs was in fact followed in the present case. First, the plaintiffs testified and presented certain documentary evidence in support of each of their claims. This was the plaintiffs' prima facie case under *Anderson*. Next, the defendants introduced evidence to rebut the plaintiffs' case, specifically the cross-examinations of the plaintiffs, the payroll charts, the calculations from the department's investigation and the testimony of Tama Brunoli and Lawrence Brunoli, Jr. The jury then evaluated the individual plaintiffs' claims arising out of each of the three projects during its deliberations,[40] ultimately awarding damages to the plaintiffs for most of their claims.[41] The adversary system, therefore, per-

[40] We note that the plaintiffs merely object to the jury charge, and do not mount a separate appellate attack on the sufficiency of the evidence supporting the verdicts, or on the adequacy of the damages awards. Accordingly, in the absence of a specific claim on appeal, we will not undertake to disturb the product of the jury's considered deliberations.

[41] We note the following relevant jury verdicts and awards in the present case. The jury awarded Scheller $3867 for unpaid wages from the Wolcott School project, but rejected his claims arising out of the UCONN and Cedarcrest Hospital projects. The jury awarded Tanski $11,009 for unpaid wages from the Wolcott School project and $1497 for unpaid wages from the UCONN project. The jury awarded Schoonmaker $23,460 for unpaid

formed the function of the *Anderson* burden shift in the present case. Put differently, once the plaintiffs had introduced sufficient evidence to justify a fair and reasonable inference of their damages, the defendants' common sense and instinct for self-preservation compelled them to introduce admissible evidence in their possession that tended to refute or negate the plaintiffs' claims of unpaid wages. We also note that the trial court's charge as given emphasized that the plaintiffs did not need to prove the amounts of their unpaid wages with precision and exactitude. The policy expressed in *Anderson* of protecting employees, therefore, was realized. Accordingly, we conclude that the improper instruction was not likely to have affected the verdict and, therefore, was harmless error.

## IV

### AWARD OF ATTORNEY'S FEES TO THE DEFENDANTS ON THE PLAINTIFFS' WRONGFUL DISCHARGE CLAIMS

The plaintiffs next claim that the trial court abused its discretion by ordering four of the plaintiffs to pay attorney's fees to the defendants, after the defendants had prevailed on five of the statutory wrongful discharge claims brought by the plaintiffs. To best analyze this claim on appeal, we first discuss the plaintiffs' separate claims, which have different factual and legal predicates. We then analyze, in the context of each claim, whether the award of attorney's fees to the defendants was justified. Finally, we will consider whether the trial court determined a proper fee amount. We ultimately conclude, however, that the trial court's

wages from the Wolcott School project and $116 from the UCONN project. The jury awarded Gianelli $622.14 for his UCONN project claims, but rejected his claims arising out of the Cedarcrest Hospital project. The jury awarded Berlepsch $11,098 for unpaid wages from the Wolcott School project and $4983 for his UCONN project claims. Finally, the jury awarded Blejewski $14,892 for his claims arising out of the Wolcott School project.

award of attorney's fees to the defendants for the plaintiffs' wrongful discharge claims was not improper.

A

Wrongful Discharge Claims of
Schoonmaker and Scheller

The following additional facts and procedural history are relevant to the disposition of this claim. Schoonmaker worked for the defendants from April, 1994, until September, 1995. He and Scheller[42] brought claims of wrongful discharge against the defendants alleging that they were terminated, in violation of §§ 31-51m,[43] 31-51q[44] and 31-73,[45] for informing the foundation of the

[42] In response to the defendants' motion for a directed verdict at the close of the plaintiffs' case-in-chief, Scheller subsequently withdrew his wrongful discharge claim.

[43] See footnote 9 of this opinion for the text of § 31-51m.

[44] See footnote 10 of this opinion for the text of § 31-51q.

[45] General Statutes § 31-73 provides: "(a) When used in this section, 'refund of wages' means: (1) The return by an employee to his employer or to any agent of his employer of any sum of money actually paid or owed to the employee in return for services performed or (2) payment by the employer or his agent to an employee of wages at a rate less than that agreed to by the employee or by any authorized person or organization legally acting on his behalf.

"(b) No employer, contractor, subcontractor, foreman, superintendent or supervisor of labor, acting by himself or by his agent, shall, directly or indirectly, demand, request, receive or exact any refund of wages, fee, sum of money or contribution from any person, or deduct any part of the wages agreed to be paid, upon the representation or the understanding that such refund of wages, fee, sum of money, contribution or deduction is necessary to secure employment or continue in employment. No such person shall require, request or demand that any person agree to make payment of any refund of wages, fee, contribution or deduction from wages in order to obtain employment or continue in employment. A payment to any person of a smaller amount of wages than the wage set forth in any written wage agreement or the repayment of any part of any wages received, if such repayment is not made in the payment of a debt evidenced by an instrument in writing, shall be prima facie evidence of a violation of this section.

"(c) The provisions of this section shall not apply to any deductions from wages made in accordance with the provisions of any law, or of any rule or regulation made by any governmental agency.

defendants' alleged failure to pay prevailing wages for public works projects and alleged record keeping failures.[46] The foundation is a private, nonprofit organization that investigates anonymous complaints of prevailing wage violations by contractors. It documents complaints before reporting them, on behalf of the employees, to the department. Schoonmaker complained to the foundation in the early summer of 1995. Schoonmaker testified that after he had complained to the foundation, personnel from the foundation physically investigated the job site at the Wolcott School project, and obtained documentation, including certified payrolls.[47] Schoonmaker testified that the presence of the foundation investigators at the Wolcott School site was not always obvious. The defendants terminated Schoonmaker's employment in September, 1995. Ultimately, questionnaires from the department inquiring

---

"(d) Any person who violates any provision of this section shall be fined not more than one hundred dollars or imprisoned not more than thirty days for the first offense, and, for each subsequent offense, shall be fined not more than five hundred dollars or imprisoned not more than six months or both."

[46] In addition to the statutory wrongful discharge claims raised in their complaint and considered at trial, Schoonmaker raises, for the first time in this case, a claim of common-law wrongful discharge. See, e.g., *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 480, 427 A.2d 385 (1980). Even if we were to assume that the plaintiffs' common-law claims are *not* precluded by the existence of the whistleblowing statute; see *Burnham* v. *Karl & Gelb, P.C.*, 252 Conn. 153, 161–62, 745 A.2d 178 (2000); *Campbell* v. *Plymouth*, 74 Conn. App. 67, 73–74, 811 A.2d 243 (2002); we, nevertheless, decline to address these common-law claims because the plaintiffs never properly raised them in the trial court by pleading them in their complaint. See, e.g., *Burnham* v. *Karl & Gelb, P.C.*, supra, 170–71; *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 48, 717 A.2d 77 (1998).

[47] Our review of the trial record reveals an inconsistency with respect to the dates of the events at issue; we note that Tanski testified that the foundation had investigated the Wolcott School job site in the summer of 1994. We conclude, however, based on the dates of the documentary exhibits submitted in this case, particularly the complaint forms, that the jury reasonably could have found that the events concerning the foundation transpired in 1995.

about the defendants' wage practices circulated around the job sites in November, 1995; subsequent testimony revealed that the defendants became aware, at that time, of these questionnaires and the ongoing department investigation.

At the close of the plaintiffs' case, the defendants moved for a directed verdict, claiming that Schoonmaker had not introduced any evidence in his case-in-chief suggesting that the defendants were aware, prior to terminating him, that he had complained to the foundation. In response, Schoonmaker contended that there was sufficient evidence, in the form of the circulated questionnaires, to support his claim. He did acknowledge, however, that he was terminated before the questionnaires were circulated, and that he had not introduced any evidence tending to prove that the defendants were aware that it was he who had filed the complaint with the foundation. Accordingly, the trial court ultimately did not submit Schoonmaker's wrongful discharge claims to the jury, a ruling that the plaintiffs took exception to.

### B

### Wrongful Discharge Claims of Berlepsch, Blejewski and Tanski

Berlepsch, Blejewski and Tanski alleged they were terminated by the defendants, also in violation of §§ 31-51m, 31-51q and 31-73, in retaliation for filing complaints with the department. Berlepsch[48] and Tanski[49] testified

[48] Berlepsch testified that he also previously had been laid off for lack of work, and then invited to return. Indeed, Berlepsch testified that in February, 1996, after the complaints already had been filed with the department, the defendants invited him back for at least one day of work; an offer that he declined because of child-care difficulties.

[49] Tanski testified that the defendants previously had laid him off temporarily for lack of work, and then rehired him. He was not rehired, however, after the November, 1995 layoff. He also testified that Lawrence Brunoli, Sr., had contacted him several weeks after his layoff, and offered to rehire him in exchange for dropping the complaint. Tanski testified that he had refused this offer.

that they were laid off in November, 1995. Blejewski testified that he was laid off in December, 1995. Blejewski also testified that after he had received the questionnaire from the department in November, he was confronted by Lawrence Brunoli, Sr.[50] He then testified that subsequent to this confrontation, he was laid off in December, 1995. All three of these plaintiffs filed complaint forms, to recover unpaid wages, with the department on January 30, 1996. Ultimately, the jury returned defendants' verdicts on the wrongful discharge claims of Berlepsch, Blejewski and Tanski.

## C

### The Defendants' Motion for Attorney's Fees

After trial, the defendants moved, pursuant to §§ 31-51m (c)[51] and 31-51q,[52] for a total of approximately $15,000 in attorney's fees incurred in defending the five wrongful discharge claims. The defendants contended that the claims of Schoonmaker and Scheller were frivolous because the complaint pleaded discharge as a

In addition, Tanski testified that in the summer of 1995, he had written and submitted an anonymous complaint about the defendants' payment practices to the department. This note, also offered and rejected for the purpose of tolling the applicable statute of limitations, was alleged to have triggered an investigation by the department into the defendants' wage practices. Tanski authenticated the anonymous note, but the trial court refused to admit it into evidence as irrelevant. The trial court stated that the note could be admissible, but only if some evidence was introduced indicating that the defendants were aware of the note's existence prior to terminating Tanski.

[50] Blejewski testified that Lawrence Brunoli, Sr., "took me outside when I was working with one of the other carpenters and asked if I received a paper from the [l]abor [b]oard. I said, yes, I did. He asked if I was going to fill it out. He said, 'We're not crooks.' And I said, 'What do you mean?' He said, 'Well, we're not crooks.' I said, 'Did you pay me properly?' He said, 'We paid you fair.' And I said, 'What do you mean, fair? You either paid me right or you didn't pay me right.' And he said, 'We paid you fair. If there's a problem, come to my office and we will straighten it out.' "

[51] See footnote 9 of this opinion for the text of § 31-51m (c).

[52] See footnote 10 of this opinion for the text of § 31-51q.

result of a complaint to the foundation, a private agency that does not fit the definition of a " '[p]ublic body' " contained in § 31-51m (a). See footnote 9 of this opinion. The trial court ordered all of the plaintiffs, except for Blejewski, to pay attorney's fees. The court concluded that it "could not find . . . a scintilla of evidence justifying the continuing, indeed the bringing of the claims for wrongful discharge by Scheller, Schoonmaker, Berlepsch and Tanski."[53] It ordered these four plaintiffs to pay $3000 each, for a total award to the defendants of $12,000 in attorney's fees.

D

The Trial Court's Award of Attorney's Fees to the
Defendants Was Justified and Not
an Abuse of Discretion

Before delving into the specifics of the plaintiffs' claim that the trial court improperly awarded the defendants attorney's fees for the defense of the wrongful discharge claims, we first set forth the applicable standard of review. It is well established that we review the trial court's decision to award attorney's fees for abuse of discretion. See, e.g., *Sorrentino* v. *All Seasons Services, Inc.*, 245 Conn. 756, 777, 717 A.2d 150 (1998). This standard applies to the amount of fees awarded; id.; and also to the trial court's determination of the factual predicate justifying the award. Cf. *Burinskas* v. *Dept. of Social Services*, 240 Conn. 141, 154 and n.17, 691 A.2d 586 (1997) (under General Statutes § 4-184a [b], which "provides that the 'court may, in its discretion,' award reasonable fees to the prevailing party if the court determines that the agency acted 'without any substantial justification,' " abuse of discretion standard applies to both award and "predicate determination"

[53] The trial court stated that it "reviewed Blejewski's testimony, and there was sufficient testimony in his . . . presentation to have permitted the jury to have inferred a wrongful motive in his layoff."

that "agency acted 'without any substantial justification' "). Under the abuse of discretion standard of review, "[w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *Ancheff* v. *Hartford Hospital*, supra, 260 Conn. 805.

The plaintiffs claim, and the defendants do not dispute, that the provision of § 31-51m (c) providing that "the court may allow to the prevailing party his costs, together with reasonable attorney's fees to be taxed by the court," permits an award of attorney's fees only if the plaintiff acted in bad faith while bringing his or her action. The plaintiffs further contend that mere failure of proof is not, by itself, grounds for an award of attorney's fees to the employer. They state that this construction of § 31-51m (c) accords with the long standing "American rule" that, "except as provided by statute or in certain defined exceptional circumstances, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser. . . . It is generally accepted that the court has the inherent authority to assess attorney's fees when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." (Citations omitted; internal quotation marks omitted.) *Fattibene* v. *Kealey*, 18 Conn. App. 344, 360, 558 A.2d 677 (1989); accord *Rizzo Pool Co.* v. *Del Grosso*, 240 Conn. 58, 72, 689 A.2d 1097 (1997); *CFM of Connecticut, Inc.* v. *Chowdhury*, 239 Conn. 375, 393–94, 685 A.2d 1108 (1996), overruled on other grounds, *State* v. *Salmon*, 250 Conn. 147, 154–55, 735 A.2d 333 (1999). We conclude that under § 31-51m (c), an employer is entitled to attorney's fees as a "prevailing party" only if the plaintiff acted in bad faith in bringing or conduct-

ing the action. See also *Jordan* v. *Learning Clinic*, Superior Court, judicial district of Windham at Putnam, Docket No. CV 95 0051042 S (October 22, 1998) (construing § 31-51m [c] and concluding that defendant employer may be "prevailing party" for purposes of receiving attorney's fees).

Indeed, a plaintiff who brings or maintains a frivolous action engages in bad faith litigation conduct, and may be ordered to pay the defendant's attorney's fees. In *Texaco, Inc.* v. *Golart*, 206 Conn. 454, 463–64, 538 A.2d 1017 (1988), this court adopted the definition of frivolous action set forth by rule 3.1 of the Rules of Professional Conduct and its comments[54] in determining whether an appeal is frivolous. This court quoted a comment to the rule and concluded that an " 'action is frivolous . . . if the client desires to have the action taken primarily for the purpose of harassing or mali-

---

[54] Rule 3.1 of the Rules of Professional Conduct provides: "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. A lawyer for the defendant in a criminal proceeding, or the respondent in a proceeding that could result in incarceration, may nevertheless so defend the proceeding as to require that every element of the case be established.

"COMMENTARY: The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure. The law, both procedural and substantive, establishes the limits within which an advocate may proceed. However, the law is not always clear and never is static. Accordingly, in determining the proper scope of advocacy, account must be taken of the law's ambiguities and potential for change.

"The filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery. Such action is not frivolous even though the lawyer believes that the client's position ultimately will not prevail. *The action is frivolous, however, if the client desires to have the action taken primarily for the purpose of harassing or maliciously injuring a person or if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification or reversal of existing law.*" (Emphasis added.)

ciously injuring a person *or* if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification or reversal of existing law.' " (Emphasis added.) Id., 464. This court adopted this definition, and further held that "the burden of proof lies on the moving party to establish the frivolity of the appeal." Id. For purposes of awarding attorney's fees to a prevailing party, the *Texaco, Inc.,* standard for determining frivolous appeals applies equally to the trial court's determination of whether a claim brought therein is frivolous. *Gerhard* v. *Veres,* 30 Conn. App. 199, 202 n.3, 619 A.2d 890 (1993); accord *CFM of Connecticut, Inc.* v. *Chowdhury,* supra, 239 Conn. 394–95 ("[w]hether a claim is colorable . . . is a matter of whether a reasonable attorney could have concluded that facts supporting the claim might be established, not whether such facts had been established" [internal quotation marks omitted]).

We conclude that the trial court, in finding that the wrongful discharge claims of Schoonmaker, Scheller, Tanski and Berlepsch were frivolous because they were not supported by a " 'scintilla of evidence,' " did not abuse its discretion in awarding attorney's fees to the defendants. Though the trial court acknowledged that the frivolity of the claims was a "close question," there is ample support in the record for the court's ruling on this issue. Indeed, the complaint of Schoonmaker and Scheller speaks for itself; it affirmatively pleaded that the plaintiffs complained to a private agency, while the statute providing the basis for their complaint expressly required a complaint to a defined " '[p]ublic body' . . . ."[55] General Statutes § 31-51m (a) (4).

---

[55] The plaintiffs claim that, with respect to Schoonmaker and Scheller, they introduced sufficient evidence to support a claim of common-law wrongful discharge and, therefore, their claims were not frivolous. We note, however, that common-law wrongful discharge was never at issue in the trial court; see footnote 46 of this opinion; accordingly, that they conceivably could

Moreover, the claims of Berlepsch and Tanski were premised on retaliation for complaints to the department; they were terminated, however, *before* they had complained.[56] Indeed, Berlepsch was invited to return to work even *after* he had filed a complaint with the department. Moreover, we note the trial court's emphasis on the fact that the plaintiffs never afforded the jury the opportunity to link, without speculation, the department questionnaires with the termination of Berlepsch and Tanski. Accordingly, we cannot say that the trial court abused its discretion in determining that the wrongful discharge claims of these four plaintiffs were frivolous.[57]

make a prima facie case on that claim has no bearing on the frivolity of their statutory claim.

[56] The plaintiffs claim that the claims of Tanski and Berlepsch merely failed for lack of proof and, therefore, were not frivolous. They claim that evidentiary rulings of the trial court, particularly the exclusion of the anonymous note, prevented them from making out a prima facie case. The plaintiffs' brief, without citing to any testimony or evidence in the record, further states that "[i]t is likely that, having come under investigation, the defendants sought to get rid of the most probable whistleblowers and would have chosen to do so by an expedient not readily identifiable as a retaliatory discharge: the layoff. Not knowing who the whistleblower was, the guilty defendants would have rid themselves of the two or three employees most likely to have been possible or potential whistleblowers." It would defy reason for us to disturb the trial court's exercise of its discretion on the basis of conclusory, indeed speculative, statements such as this.

[57] We note that the defendants' motion for attorney's fees was made pursuant to § 31-51m (c), as well as § 31-51q, which applies to cases wherein adverse employment action is alleged in retaliation for the exercise of first amendment rights, and provides in relevant part that "[i]f the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer." All parties, however, have confined their analysis of this issue solely to § 31-51m (c).

We note, however, that General Statutes § 4-184a (b) allows the court in administrative appeals to, "in its discretion, award to the prevailing party, other than the agency, reasonable fees and expenses in addition to other costs if . . . the court determines that the action of the agency was undertaken *without any substantial justification.*" (Emphasis added.) This court has concluded that the phrase "'without any substantial justification' [means] entirely unreasonable or without any reasonable basis in law or fact." *Burinskas* v. *Dept. of Social Services*, supra, 240 Conn. 156. Inasmuch

E

## The Trial Court Did Not Abuse its Discretion in Determining the Amount of Attorney's Fees that it Awarded to the Defendants

The plaintiffs claim that the trial court abused its discretion when it determined the amount of attorney's fees to award to the defendants, a total of $12,000 from the four claims of Berlepsch, Schoonmaker, Scheller and Tanski. Specifically, the plaintiffs contend that the court improperly used different standards in determining the fee awards for the attorneys of each party. Moreover, the plaintiffs claim that the trial court improperly awarded attorney's fees to defendants who came before it with " 'unclean hands.' " The defendants contend in response that the trial court properly exercised its discretion, and made an " 'informed and logical decision' " based on its personal observations, and the supporting materials. We conclude that the trial court did not abuse its discretion in awarding the defendants a total of $12,000 in attorney's fees for their defense of these wrongful discharge claims.

The defendants, in their attorney's affidavit in support of their motion, requested $3000 per claimant in attorney's fees. The defendants' attorney claimed that of the total of $114,000 in fees incurred in defending all of the plaintiffs' claims in this matter, approximately $15,000 arose from the defense of the five wrongful discharge claims. After setting forth the extensive civil litigation experience of defense counsel,[58] the affidavit stated that counsel billed the defendants for defense of the present

---

as this definition is sufficiently analogous to frivolous, the foregoing analysis under § 31-51m (c) is equally applicable to attorney's fee requests in § 31-51q cases.

[58] Defense counsel stated in his affidavit that he has been engaged in the continuous practice of law since 1980, and that more than 80 percent of his practice is devoted to civil litigation in both state and federal, trial and appellate courts.

matter at an hourly rate. The hourly rate was $190 for the defendants' primary counsel, and $130 to $150, depending on experience, for the work of counsel's associates. Counsel stated in the affidavit that, although he kept daily time records, with entry descriptions, he was unable to "determine with any precision which portion of an entry was devoted to the defense of the wrongful discharge counts." Counsel did state, however, that with respect to the wrongful discharge claims, he needed to engage in discovery,[59] preparation of opening and closing arguments, preparation of jury instructions, questioning of both parties' witnesses on direct and cross-examination, and participation in court-ordered mediation. At oral argument before the trial court, defense counsel stated that he used a "good faith allocation," based on his performance of these enumerated tasks, to arrive at his final estimate, and request, of $15,000 in fees. After determining that the plaintiffs, except for Blejewski, had "no evidence and no justification for maintaining" the wrongful discharge claims, the trial court granted the defendants $3000 in attorney's fees for each of the remaining four plaintiffs, arriving at a total award of $12,000.

We are mindful that "[t]he amount of attorney's fees to be awarded rests in the sound discretion of the trial court and will not be disturbed on appeal unless the trial court has abused its discretion: A court has few duties of a more delicate nature than that of fixing counsel fees. The degree of delicacy increases when the matter becomes one of review on appeal. The principle of law, which is easy to state but difficult at times to apply, is that only in case of a clear abuse of discretion by the trier may we interfere. . . . The trier is always

---

[59] As stated in the affidavit of defendants' counsel, the discovery included preparation of interrogatories, requests for production, review of produced tax materials, and time spent with respect to the depositions of each of the five claimants.

in a more advantageous position to evaluate the services of counsel than are we." (Citation omitted; internal quotation marks omitted.) *Link* v. *Shelton,* 186 Conn. 623, 629, 443 A.2d 902 (1982); accord *Sorrentino* v. *All Seasons Services, Inc.,* supra, 245 Conn. 774.

It is well established that a trial court calculating a reasonable attorney's fee makes its determination while considering the factors set forth under rule 1.5 (a) of the Rules of Professional Conduct.[60] *Sorrentino* v. *All Seasons Services, Inc.,* supra, 245 Conn. 775 ("[r]ule 1.5 [a] of the Rules of Professional Conduct lists the factors that ordinarily determine the reasonableness of an attorney's fee"); *Andrews* v. *Gorby,* 237 Conn. 12, 24, 675 A.2d 449 (1996) ("[t]ime spent is but one factor in determining the reasonableness of an attorney's fee"). A court utilizing the factors of rule 1.5 (a) considers, inter alia, the time and labor spent by the attorneys, the novelty and complexity of the legal issues, fees customarily charged in the same locality for similar services, the lawyer's experience and ability, relevant time limitations, the magnitude of the case and the results obtained, the nature and length of the lawyer-client relationship, and whether the fee is fixed or contingent. See, e.g., *Sorrentino* v. *All Seasons Services, Inc.,* supra, 775; *Andrews* v. *Gorby,* supra, 24 n.19.

---

[60] Rule 1.5 (a) of the Rules of Professional Conduct provides: "A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

"(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

"(2) The likelihood, if made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

"(3) The fee customarily charged in the locality for similar legal services;

"(4) The amount involved and the results obtained;

"(5) The time limitations imposed by the client or by the circumstances;

"(6) The nature and length of the professional relationship with the client;

"(7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and

"(8) Whether the fee is fixed or contingent."

Given the information presented in counsel's affidavit about the labor involved in defending the plaintiffs' wrongful discharge claims, counsel's experience, and the fixed hourly rates that the defendants paid their attorneys, we cannot say that the trial court abused its discretion in awarding $3000 in fees for each of the four plaintiffs. The court plainly made an informed decision when applying the facts to the legal principles defining a reasonable attorney's fee.[61] Accordingly, we decline to set aside the award as an abuse of the trial court's discretion.[62]

## V

### INTEREST ON THE PLAINTIFFS' CLAIMS OF UNPAID WAGES PURSUANT TO §§ 31-72, 37-3a AND 31-265

The plaintiffs, relying primarily on the Appellate Court's decision in *Crowther* v. *Gerber Garment Technology, Inc.*, 8 Conn. App. 254, 266, 513 A.2d 144 (1986),

[61] We disagree with the plaintiffs' contention that the trial court abused its discretion by applying a " 'devaluation' " standard in determining the plaintiffs' attorney's fees, but not the defendants' attorney's fees. When the trial court awarded fees to the plaintiffs in the amount of $39,750, it analyzed the documents and devalued the plaintiffs' requested fees in both hours and rate. The court concluded that many of the pretrial hours of the plaintiffs' attorneys were overbilled, and also considered the effect of a last minute substitution of trial counsel. See part VI and footnotes 72 and 73 of this opinion. Our analysis of the trial court's rulings on attorney's fees indicates that it consistently applied the appropriate reasonableness standard, under the rubric of the factors set forth by rule 1.5 (a) of the Rules of Professional Conduct, to the fee awards requested by both parties. The " 'devaluation,' " therefore, was merely one aspect of the trial court's appropriate exercise of its discretion in determining reasonable attorney's fee awards.

[62] We also disagree with the plaintiffs' contention that the trial court improperly awarded attorney's fees to defendants who came before it with " 'unclean hands.' " The jury's conclusion that the defendants acted in bad faith, arbitrarily and unreasonably with regard to the plaintiffs' prevailing wages claims bears no relevance to the wrongful discharge claims, which are an entirely different cause of action. Indeed, a meritorious claim on one count of the complaint will neither shield, nor rescue, a plaintiff from the consequences of filing a frivolous action using a different count of the same omnibus complaint.

next claim that the trial court incorrectly failed to award them interest, pursuant to General Statutes § 37-3a,[63] on the verdict amounts, in addition to the double damages awarded under § 31-72. The defendants claim, in response, that the plaintiffs' claim was not raised in the trial court and, therefore, is not preserved for appellate review.[64] The plaintiffs contend that the matter was preserved, and request, in the alternative, plain error review. We conclude that the plaintiffs failed to preserve this issue properly for appellate review, and also that plain error review is not warranted in the present case.

The following additional facts and procedural history are relevant for the disposition of the plaintiffs' claim. The interest issue first arose when the jury, during deliberations, requested instructions on whether to consider interest on the wages due to the plaintiffs. At that time, the parties and the court briefly addressed the issue of whether § 31-72,[65] by incorporating the terms of General Statutes § 31-265,[66] would provide for an award of inter-

---

[63] General Statutes § 37-3a provides in relevant part: "Except as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable. . . ."

[64] The defendants also contend, alternatively, that § 31-72 provides no basis for an award of interest in the present case.

[65] The relevant provision of § 31-72 provides that "[t]he Labor Commissioner may collect the full amount of any such unpaid wages, payments due to an employee welfare fund or such arbitration award, as well as *interest calculated in accordance with the provisions of section 31-265 from the date the wages or payment should have been received,* had payment been made in a timely manner." (Emphasis added.)

[66] General Statutes § 31-265, which applies to interest on contributions not paid when due, provides: "Contributions unpaid on the date on which they are due and payable in accordance with the provisions of this chapter shall bear interest for each month or fraction thereof after such date until payment, plus accrued interest, has been received by the administrator, provided no person shall be required to pay interest for any period during which he may have performed military service in the armed forces of the United States or of the United Nations subsequent to June 25, 1950. The

est in the present case. The plaintiffs' counsel initially had contended that § 31-72 provides for an award of interest, to be awarded by the court postverdict. After some discussion on the matter, the trial court concluded, and the plaintiffs' counsel expressly agreed, that "[t]he interest in the statute [§§ 31-72 and 31-265] is on [a] failed contribution for a fund, which you indicated . . . you did not claim." The trial court subsequently instructed the jury to confine its inquiry solely to the amount of wages due the plaintiffs and the questions on the interrogatories, and not to consider extra matters such as calculations of attorney's fees or interest. Neither party excepted to this supplemental instruction.

The issue of interest arose again after the jury returned its verdict. In addition to filing a motion pursuant to § 31-72 to double the verdict, the plaintiffs individually submitted motions for additur. These motions for additur, however, as the plaintiffs' counsel acknowledged before the trial court, did not request the addition of interest to the verdicts awarded by the jury. The plaintiffs' counsel did state, however, that the request for interest was included in the postverdict memorandum of law, but not in the motion. Despite conceding that interest was not available by incorporating § 31-265 into § 31-72, the plaintiffs orally argued before the trial court that interest was, nevertheless, available because "if there is recovery under a private lawsuit,

administrator may prescribe fair and reasonable regulations whereby interest shall not accrue during the first five calendar quarters that any employer is subject to this chapter. Interest collected pursuant to this section shall be paid into the Employment Security Special Administration Fund. For purposes of this section, the interest rate on such unpaid contributions shall be determined by the administrator, on the last banking day in October of each calendar year, for use in the succeeding calendar year, and shall be two per cent per annum plus a simple average of the prime lending rates on such date at the three largest commercial banks in the state in terms of total assets, except that in no event shall the interest on unpaid contributions be less than twelve per cent per annum."

there is a right to interest on the back due wages." The trial court expressed its concern that both it, and the defendants, were unfairly deprived of notice of this claim because the plaintiffs failed to include it in a motion. The court then engaged in further discussion with the parties to confirm that the colloquy, prior to the supplemental jury instruction, solely was confined to the effect of § 31-265 on § 31-72.

After this discussion, the plaintiffs then conceded, in response to questions from the trial court, that they had not made a motion for interest, and that the time for making such a motion had passed.[67] The plaintiffs' counsel, moreover, acknowledged that "since [the interest claim was not] raised in a motion, I can't pursue it." The plaintiffs then asked the court for a finding of wrongful detention of money under General Statutes § 31-73.[68] The court rejected this request, concluding

---

[67] To best illustrate this discussion, we set forth the following colloquy between the plaintiffs' counsel and the trial court:

"The Court: But you have no motion for interest?

"[Plaintiffs' Counsel]: That's correct.

"The Court: And the time has passed for such a motion?

"[Plaintiffs' Counsel]: Yes, Your Honor.

"The Court: So how are you going to get around that?

"[Plaintiffs' Counsel]: I'm not, Your Honor.

"The Court: Do I hear you say that you are abandoning your claim of interest in this case, except for postjudgment, of course?

"[Plaintiffs' Counsel]: No, Your Honor. But since it wasn't raised in a motion, I can't pursue it."

[68] General Statutes § 31-73 provides in relevant part: "(a) When used in this section, 'refund of wages' means: (1) The return by an employee to his employer or to any agent of his employer of any sum of money actually paid or owed to the employee in return for services performed or (2) payment by the employer or his agent to an employee of wages at a rate less than that agreed to by the employee or by any authorized person or organization legally acting on his behalf.

"(b) No employer, contractor, subcontractor, foreman, superintendent or supervisor of labor, acting by himself or by his agent, shall, directly or indirectly, demand, request, receive or exact any refund of wages, fee, sum of money or contribution from any person, or deduct any part of the wages agreed to be paid, upon the representation or the understanding that such refund of wages, fee, sum of money, contribution or deduction is necessary

that this was a claim that was appropriate to raise earlier, for submission to the jury. The court noted that the plaintiffs neither requested nor excepted to its failure to submit this issue to the jury for a factual determination.

The trial court then attempted to clarify whether the plaintiffs were abandoning their interest claims. At this point, the plaintiffs reiterated their position that interest, calculated in accordance with § 31-265, is to be awarded to prevailing plaintiffs under § 31-72. Finally, in response to questioning from the trial court, the plaintiffs' counsel stated that he could not recall if he had raised that argument during the trial. The trial court then stated its "very clear recollection" that the issue had not been raised during the trial. The plaintiffs then again admitted that they had not appropriately raised the issue by a postverdict motion. Finally, the court asked: "[I]f I were to grant interest, how would I do that without trampling on the [defendants'] rights, since there is no motion, you abandoned the claim during trial, and there was no request to submit to the jury the wrongful detention of money under [§] 31-73 (a)?" The plaintiffs counsel concluded this discussion by answering the court's question: "Because it's provided for in [§] 31-72, Your Honor."

We conclude that this issue is not preserved for appellate review because, by not filing the appropriate motion for an award of interest, the plaintiffs denied the trial court the opportunity to act and correct any

to secure employment or continue in employment. No such person shall require, request or demand that any person agree to make payment of any refund of wages, fee, contribution or deduction from wages in order to obtain employment or continue in employment. A payment to any person of a smaller amount of wages than the wage set forth in any written wage agreement or the repayment of any part of any wages received, if such repayment is not made in the payment of a debt evidenced by an instrument in writing, shall be prima facie evidence of a violation of this section. . . ."

potential error. Practice Book § 60-5 provides in relevant part that "[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ." Indeed, it is the appellant's "responsibility to present such a claim clearly to the trial court so that the trial court may consider it and, if it is meritorious, take appropriate action. That is the basis for the requirement that ordinarily [the appellant] must raise in the trial court the issues that he intends to raise on appeal." (Internal quotation marks omitted.) *In re Jonathan S.*, 260 Conn. 494, 505, 798 A.2d 963 (2002). For us "[t]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge. . . . We have repeatedly indicated our disfavor with the failure, whether because of a mistake of law, inattention or design, to object to errors occurring in the course of a trial until it is too late for them to be corrected, and thereafter, if the outcome of the trial proves unsatisfactory, with the assignment of such errors as grounds of appeal." (Citation omitted; internal quotation marks omitted.) *Simmons* v. *Simmons*, 244 Conn. 158, 187, 708 A.2d 949 (1998).

By not filing the appropriate motion, the plaintiffs tied the hands of the trial court; they denied it the opportunity to act and correct any potential errors with respect to this issue, especially when the underlying confusion about the status of the plaintiffs' position with respect to interest awards under § 31-72 is taken into account. Accordingly, we conclude that the interest issue was not properly preserved for appellate review, and we decline the plaintiffs' invitation to engage in

"appeal by ambuscade" by considering the merits of this issue.[69] *In re Jonathan S.*, supra, 260 Conn. 505.

## VI

## CROSS APPEAL: DEPARTURE FROM CONTINGENCY FEE AGREEMENT IN DETERMINING ATTORNEY'S FEES

The defendants' first claim in their cross appeal is that, in awarding attorney's fees to the plaintiffs pursuant to § 31-72,[70] the trial court abused its discretion by deviating from the plaintiffs' contingency fee agreement. Specifically, the defendants contend that, under this court's decision in *Sorrentino* v. *All Seasons Services, Inc.*, supra, 245 Conn. 773–77, a trial court calculating an award of reasonable attorney's fees abuses its discretion by departing from a contingency

---

[69] The plaintiffs also claim that the trial court's failure to award interest in the present case constituted plain error. Plain error review is "reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *HLO Land Ownership Associates Ltd. Partnership* v. *Hartford*, 248 Conn. 350, 361, 727 A.2d 1260 (1999).

We note, however, that "we will not review an underlying claim for plain error unless the request for relief under that doctrine has been adequately briefed." *Pestey* v. *Cushman*, 259 Conn. 345, 373, 788 A.2d 496 (2002). A party claiming plain error must engage in a separate analysis under that doctrine to "demonstrate that plain error has occurred under the circumstances of [the] case." Id. Indeed, a mere conclusory assertion of plain error is insufficient to allow this court to reach the merits of an unpreserved claim under that doctrine. Id. Our review of the plaintiffs' reply brief reveals that the plain error claim is limited to a statement of the black letter of the doctrine, without linking it to the specific circumstances presented by this case. We, therefore, decline to reach the merits of the plaintiffs' claim under the plain error doctrine because they failed to brief the issue adequately.

[70] Section 31-72 provides in relevant part: "When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, or fails to compensate an employee in accordance with section 31-76k . . . such employee or labor organization may recover, in a civil action, twice the full amount of such wages, with costs and *such reasonable attorney's fees as may be allowed by the court* . . . ." (Emphasis added.)

fee agreement, without first finding that agreement unreasonable by its terms. The plaintiffs claim, in response, that the application of the *Sorrentino* reasonableness inquiry is limited to the ultimate fee calculation, and not to the terms of the agreement itself. They also contend that the defendants' application of *Sorrentino* frustrates the legislative purposes of § 31-72, which are to punish the employer and make the injured employee whole. We conclude that the trial court abused its discretion in its attorney's fee determination by improperly departing from the contingency fee agreement.

The following additional facts and procedural history are relevant for the disposition of this claim. Following the trial, the plaintiffs submitted a motion pursuant to § 31-72 requesting attorney's fees in a total amount in excess of $222,000. The plaintiffs' motion was accompanied by a supporting affidavit, memorandum of law, time records and a contingency fee and retainer contract. In their affidavit, the plaintiffs' attorneys stated an hourly rate of $200 per hour for out-of-court work, and $250 per hour for in-court argument, jury selection and trial. The affidavit stated that, under those rates, they had incurred $83,689 in fees from March, 1995, through November, 2000; $42,183 in fees from December, 2000, through January 3, 2001; and more than $100,000 between January 3, 2001, and January 29, 2001, a period that included the trial of the case. The contingency fee agreement provided for payment to the attorneys of one third (33.3 percent) of any gross recovery.[71] After the trial court granted the plaintiffs' motion to double the jury awards, as reduced by the court for the amounts that had been awarded for the Wolcott School claims, the gross recovery was $14,436.28. One third of

[71] The contingency fee agreement also provided that the plaintiffs would pay costs, which, if advanced by counsel, would be deducted from the gross recovery before attorney's fees were paid.

that amount would have yielded a contingency fee of approximately $4812.10.

The trial court granted, over the defendants' objection, attorney's fees to the plaintiffs in the amount of $39,750. In so ruling, the trial court heard arguments from the parties regarding the application of this court's decision in *Sorrentino*. The trial court also considered the individual entries on the billing records of the plaintiffs' attorneys. Ultimately, the court arrived at the award of $39,750, concluding that many of the pretrial hours were overbilled,[72] and devaluing them accordingly.[73] The trial court also stated that "[t]he allocation of a reasonable attorney's fee is not really complicated by the existence of the contingency fee agreement. . . . [I]t would be unreasonable to impose a contingency fee limitation on the reasonable attorney's fee."

In reviewing the defendants' claim, we are mindful of the "delicate nature" of the trial court's duty in calculating reasonable attorney's fees, and that "[t]he amount of attorney's fees to be awarded rests in the sound discretion of the trial court and will not be disturbed on appeal unless the trial court has abused its discretion. . . . The trier is always in a more advantageous position to evaluate the services of counsel than are we." (Citation omitted; internal quotation marks omitted.) *Link* v. *Shelton*, supra, 186 Conn. 629; accord *Sorrentino* v. *All Seasons Services, Inc.*, supra, 245 Conn. 774.

Moreover, as discussed previously, Connecticut follows the "American rule," a general principle under

[72] As an example of what it deemed overbilling, the trial court cited a time entry of "four hours of research on the applicability of [the Connecticut Unfair Trade Practices Act] to [the] employer/employee relationship. That is a fifteen minute piece of legal research, at most."

[73] Because of personnel complications, the law firm of the plaintiffs' counsel substituted new trial counsel on the eve of trial; indeed, jury selection already had commenced. The trial court acknowledged this in devaluing the pretrial time spent on the matter by the plaintiffs' law firm.

which, "attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception." (Internal quotation marks omitted.) *Rizzo Pool Co.* v. *Del Grosso*, supra, 240 Conn. 72. In the present case, § 31-72 provides the statutory predicate for an award of "reasonable attorney's fees" to prevailing plaintiffs; it is well established, however, that it is appropriate for a plaintiff to recover attorney's fees, and double damages under that statute, only when the trial court has found that the defendant acted with "bad faith, arbitrariness or unreasonableness." (Internal quotation marks omitted.) *Sansone* v. *Clifford*, 219 Conn. 217, 229, 592 A.2d 931 (1991). In the present case, the jury made the requisite, and indeed unchallenged, finding of bad faith, arbitrariness or unreasonableness, thereby authorizing an award of attorney's fees pursuant to § 31-72.

Having established a statutory basis for an award of reasonable attorney's fees in the present case, our next step in our analysis is to parse this court's decision in *Sorrentino* v. *All Seasons Services, Inc.*, supra, 245 Conn. 774, a decision in which this court determined "the extent to which a reasonable fee agreement should be the basis for a court's award of reasonable attorney's fees." In *Sorrentino*, a jury awarded the plaintiff economic and noneconomic damages for retaliatory discharge in violation of General Statutes § 31-290a. Id., 758–59. The plaintiff moved for attorney's fees pursuant to § 31-290a (b) (1), which provided that "[a]ny employee who prevails in such a civil action shall be awarded reasonable attorney's fees and costs to be taxed by the court . . . ." The plaintiff had a fee agreement with his counsel providing a fee of one third of any recovery, under which the appropriate fee would have been $48,643.57. Id., 773–74. The trial court, however, awarded only $30,000 in attorney's fees, concluding that the billing records submitted by the plaintiff

did not justify the higher fee. Id., 774. The plaintiff appealed from that determination.

On appeal, this court, after considering the factors for reasonableness of a fee as set forth by rule 1.5 (a) of the Rules of Professional Conduct,[74] held that "[a] trial court should not depart from a reasonable fee agreement in the absence of a persuasive demonstration that enforcing the agreement would result in substantial unfairness to the defendant." Id., 776. The court stated that the agreement itself was reasonable, and concluded that the billing practices that the trial court found objectionable, which included billing for the services of nonlawyers and two attorneys billing separately for their services, were not "sustainable grounds" for departing from the fee agreement; accordingly, the trial court abused its discretion in doing so. Id., 776–77.

We conclude that, under this court's decision in *Sorrentino*, when a contingency fee agreement exists, a two step analysis is required to determine whether a trial court permissibly may depart from it in awarding a reasonable fee pursuant to statute or contract. The trial court first must analyze the terms of the agreement itself.[75] Id., 774. If the agreement is, by its terms, reasonable,[76] the trial court may depart from its terms only

---

[74] See footnote 60 of this opinion.

[75] The plaintiffs contend that under *Sorrentino*, the reasonableness analysis is applicable to the fee amount that results from the contingency fee agreement, and not to the terms of the contract itself. We disagree with this characterization of the *Sorrentino* analysis. Indeed, the court in *Sorrentino* expressly stated that "[i]t is significant that the [trial] court made no finding that the fee agreement itself was unreasonable in any respect." *Sorrentino* v. *All Seasons Services, Inc.*, supra, 245 Conn. 776. Only after discussing the reasonableness of the agreement itself did the court explore whether the trial court had abused its discretion by departing from its terms. Id., 776–77.

[76] To be reasonable, a contingency fee agreement, must, at the very least, comply with the prescriptions of subsections (c) and (d) of rule 1.5 of the Rules of Professional Conduct. Rule 1.5 (c) of the Rules of Professional Conduct provides: "A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by subsection (d) or other law. A contingent fee agreement

when necessary to prevent "substantial unfairness" to the party, typically a defendant, who bears the ultimate responsibility for payment of the fee.[77] Id., 776. By con-

shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages of the recovery that shall accrue to the lawyer as a fee in the event of settlement, trial or appeal, whether and to what extent the client will be responsible for any court costs and expenses of litigation, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination."

Rule 1.5 (d) of the Rules of Professional Conduct provides: "A lawyer shall not enter into an arrangement for, charge, or collect:

"(1) Any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a dissolution of marriage or upon the amount of alimony or support, or property settlement in lieu thereof; or

"(2) A contingent fee for representing a defendant in a criminal case."

We note that the reasonableness of the contingent fee percentage itself may also be influenced by statutory requirements; see General Statutes § 52-251c (limiting fees to enumerated percentages in personal injury, wrongful death or damage to property actions); or, by factors such as the degree of risk that is presented by the contingency. See, e.g., L. Brickman, "Contingent Fees Without Contingencies: *Hamlet* Without the Prince of Denmark," 37 UCLA L. Rev. 29, 31–32 (1989); W. Hodes, "Cheating Clients with the Percentage-of-the-Gross Contingent Fee Scam," 30 Hofstra L. Rev. 767, 771 n.15 (2002).

[77] In this vein, we agree with the recent characterization of *Sorrentino* by the United States District Court for the District of Connecticut. In *Fabri* v. *United Technologies, International, Inc.,* 193 F. Sup. 2d 480, 484–85 (D. Conn. 2002), the jury had awarded, under a Connecticut Unfair Trade Practices Act (CUTPA) claim, the plaintiffs $500,000 in punitive damages, and $1 in nominal damages. The plaintiffs then moved for attorney's fees in the amount of $1,583,002.26, pursuant to CUTPA, General Statutes § 42-110g (d). Id., 482. The plaintiffs had a contingency fee agreement providing for a fee of 35 percent of the plaintiffs' total recovery. Id., 483. The defendants claimed that the plaintiffs' award should be capped by the agreement. Id. The District Court rejected that contention, relying on the plain language of § 42-110g (d), which provides that " '[t]he court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable *attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery.*' " (Emphasis added.) Id., 483.

In its analysis, the District Court considered the defendants' claim that, under *Sorrentino,* the court should not depart from the contingency fee agreements. The court distinguished *Sorrentino,* based on the differences in statutory language providing for attorney's fees, between the two cases.

trast, if the trial court concludes that the agreement is, by its terms, unreasonable, it may exercise its discretion and award a reasonable fee in accordance with the factors enumerated in rule 1.5 (a) of the Rules of Professional Conduct. See footnote 60 of this opinion.

We conclude, therefore, that the trial court improperly departed from the terms of the contingency fee agreement in awarding reasonable attorney's fees to the plaintiffs. In rendering its decision, the court did not first consider the reasonableness of the underlying contingency fee agreement, stating instead that "[i]t would be unreasonable to impose a contingency fee limitation on the reasonable attorney's fee." This ruling, therefore, violated both the letter and spirit of this court's decision in *Sorrentino* by not giving the existing contingency fee agreement its due regard.

The plaintiffs, citing the legislative purpose of § 31-72, claim that limiting the attorney's fees to the amount set forth by the contingency fee agreement interferes with the legislative purpose of punishing employers and making employees whole under § 31-72. We disagree with this contention because, although we previously have acknowledged the punitive and remedial purposes of § 31-72; *Shortt* v. *New Milford Police Dept.*, 212 Conn. 294, 309 n.13, 562 A.2d 7 (1989); the plaintiffs' argument incorrectly confuses adequate compensation for unpaid employees with windfall compensation for those employees' attorneys. We do not disagree that the double damages provision of § 31-72 was intended to punish employers and make employees whole. The double damages provision, however, is a monetary award sepa-

---

Id., 484. The court, however, also stated that "[e]ven construing *Sorrentino* to apply to all state fee statutes, it holds at best that contingent fee agreements are a floor to a reasonable award." It stated that application of the *Sorrentino* rule in this manner protects the plaintiff's jury award by ensuring that the fees ordered are sufficient to cover the plaintiff's financial obligation, under the contingency fee agreement, to its attorney. Id., 484–85.

rate and apart from that of attorney's fees.[78] General Statutes § 31-72. As long as the court awards attorney's fees that are sufficient to cover a plaintiff's financial obligations to his or her attorney, such as an existing contingency fee agreement, the employee still will be made whole by the award of double damages. We, therefore, deem disingenuous the notion that a fee award that is disappointing to the plaintiff's attorney has any relation to the act of compensating the plaintiff himself or herself.[79] Accordingly, we conclude that, in awarding reasonable attorney's fees, the trial court abused its discretion by improperly departing from the terms of the contingency fee agreement that existed between the plaintiffs and their counsel.[80]

[78] Indeed, when the double damages provision was added in 1978 to § 31-72 as Public Acts 1978, No. 78-358, § 2, the attorney's fee provision already had been part of the statute for more than twenty-five years. See Public Acts 1951, No. 70. Neither the language of the 1951 enactment, nor its legislative history, indicate a legislative purpose beyond that of authorizing employees, or the labor commissioner acting on their behalf, to institute civil actions for the collection of unpaid wages. See 4 H.R. Proc., Pt. 2, 1951 Sess., p. 817.

[79] This conclusion is consistent with the element of measured risk that underlies the use of contingency fees. Indeed, as Professor Lester Brickman notes: "The most commonly cited historic justification for the contingent fee is its function as a financing device that enables a client to assert and prosecute an otherwise unaffordable claim. Today, however, even a client who can afford an hourly fee may prefer a contingent fee if the client is sufficiently risk-averse. The contingent fee functions as a hedge: the client's exposure to loss is limited by the attorney's assumption of the fee risk, while the client's potential gain is also limited by the 'sale' of a percentage of the claim to the attorney. Thus, risk sharing has emerged as a complementary justification for contingent fees." L. Brickman, "Contingent Fees Without Contingencies: *Hamlet* Without the Prince of Denmark," 37 UCLA L. Rev. 29, 44 (1989).

[80] The plaintiffs claim in their appeal that, although the trial court correctly departed from the terms of the contingency fee agreement, it nevertheless abused its discretion in its determination of the appropriate amount of counsel fees, particularly its devaluation method. In light of our conclusion that the trial court improperly departed from the terms of the contingency fee agreement, we need not reach the plaintiffs' claim.

## VII

## CROSS APPEAL: ACCORD AND SATISFACTION OF UCONN PROJECT CLAIMS

The defendants' second claim in their cross appeal is that the trial court improperly failed to grant their motion to set aside the verdict in favor of the plaintiffs on the claims of Berlepsch, Gianelli and Tanski that arose out of the UCONN project. Specifically, the defendants contend that, under the evidence presented at trial, the only reasonable conclusion the jury could have arrived at is that those claims were settled, and therefore, barred by the doctrine of accord and satisfaction. The plaintiffs contend, in response, that sufficient evidence was introduced at trial to support the jury's conclusion that the plaintiffs' claims were not barred by the doctrine of accord and satisfaction. We conclude that the trial court properly refused to grant the defendants' motion to set aside the verdict on the claims of Berlepsch, Gianelli and Tanski arising out of the UCONN project.

The following additional facts and procedural history are necessary for the resolution of the defendants' claim. The defendants pleaded as a special defense that the claims of Berlepsch, Gianelli and Tanski arising out of the UCONN project were barred by the doctrine of accord and satisfaction. Pechie, the department's director of wage enforcement, and Barrachina, a department supervisor, testified that after an employee submits a wage claim to the department by completing a complaint form, the department investigates and attempts, when appropriate, to collect the unpaid wage claims. They testified that if the department's collection efforts were unsuccessful, the department would refer the claims to the attorney general's office. Barrachina testified that, in the present case, the department investigated the UCONN project claims of Berlepsch, Gianelli

and Tanski, and concluded that the defendants owed them $1812.45, $622.45 and $947.43, respectively. The department subsequently referred those claims to the attorney general's office for collection.

Thereafter, Assistant Attorney General Glenn Woods, who routinely represented the department in its collection efforts, sent a letter, dated July 23, 1996, to the defendants' attorneys. In this letter, Woods advised the defendants' counsel that on June 14, 1996, he had received payments, from the defendants to the three plaintiffs, in the previously mentioned amounts. Specifically, the letter stated that Woods "confirm[ed] that the Attorney General and the [department] have been assigned the claims of the aforementioned three claimants. Further, the payments for these individuals are accepted in full satisfaction of all outstanding wage claims, with regard to these three claimants, pertaining to the [UCONN project]."

The plaintiffs testified, however, that they did not agree with the settlement negotiated by the attorney general's office; they, therefore, did not accept or cash the checks sent to that office by the defendants.[81] Berlepsch testified that he had received a check from the defendants in the amount of $1812.45, the amount that the department concluded he was owed. Berlepsch testified that he turned the check over to his attorney and, subsequently, initiated the present action. Tanski was more elusive in his testimony; he testified that there was a "possibility," that he had received, and given to his attorney, two checks from the defendants, in the total amount of $947.43.[82] The plaintiffs initiated this

[81] We note that the plaintiffs claim, in their brief, that they introduced testimony to support this factual proposition. The plaintiffs' supporting citation to the record, however, merely refers to a representation, to the trial court by counsel, about expected testimony from Barrachina. The remaining relevant facts were gleaned from this court's independent and painstaking review of the trial record.

[82] Our review of the record reveals no testimony on this subject by Gianelli.

action in March, 1996, and filed a revised complaint in August, 1996.

The defendants moved for summary judgment on these claims on the ground that the claims were barred by the doctrine of accord and satisfaction. The trial court denied this motion and, subsequently, submitted these claims and the accord and satisfaction defense to the jury. The jury concluded that the defendants had failed to pay these plaintiffs the proper prevailing wages for work performed at the UCONN project, and also found that the defendants had failed to prove that the plaintiffs' claims were settled or released. The jury then awarded damages to each of the plaintiffs in the amounts that they had found the plaintiffs were underpaid. Thereafter, the defendants moved to set aside these verdicts. In ruling on this motion, the trial court concluded that this was a factual issue and deferred to the jury's findings, stating that it was not convinced there was no reasonable basis for the verdict. Accordingly, the trial court denied the defendants' motion to set aside the verdicts.

"We begin by setting forth the standard of review that governs the review of a trial court's denial of a motion to set aside the verdict. Such review involves a determination of whether the trial court abused its discretion, according great weight to the action of the trial court and indulging every reasonable presumption in favor of its correctness . . . . since the trial judge has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to their evidence. . . . [A trial court may] set aside a verdict where it finds it has made, in its instructions, rulings on evidence, or otherwise in the course of the trial, a palpable error which was harmful to the proper disposition of the case and probably brought about a different result in the verdict." (Citations omitted; internal quotation marks

omitted.) *Bovat* v. *Waterbury*, 258 Conn. 574, 583, 783 A.2d 1001 (2001).

The hornbook Connecticut law governing the doctrine of accord and satisfaction, as recently set forth by this court in *B & B Bail Bonds Agency of Connecticut, Inc.* v. *Bailey*, 256 Conn. 209, 212–13, 770 A.2d 960 (2001), provides an appropriate background for resolving the defendants' claim that the trial court abused its discretion in denying their motion to set aside the verdict. "When there is a good faith dispute about the existence of a debt or about the amount that is owed, the common law authorizes the debtor and the creditor to negotiate a contract of accord to settle the outstanding claim. . . . An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. . . . *Upon acceptance of the offer of accord, the creditor's receipt of the promised payment discharges the underlying debt and bars any further claim relating thereto,* if the contract is supported by consideration. . . . Although the case law presents the more usual use of accord and satisfaction as a defense by the debtor against the creditor, it is evident that accord and satisfaction equally applies to both parties. Accord and satisfaction is a method of discharging a claim whereby the parties agree to give and accept something other than that which is due in settlement of the claim and to perform the agreement." (Citations omitted; emphasis added; internal quotation marks omitted.) Id. Indeed, a validly executed accord and satisfaction precludes a party from "pursuing any action involving the original, underlying claim." Id., 213. The defendant bears the burden of proving accord and satisfaction when it is pleaded as a special defense. *Prishwalko* v. *Bob Thomas Ford, Inc.*, 33 Conn. App. 575, 589, 636 A.2d 1383 (1994).

Under this basic framework, the dispositive issue thus becomes whether the plaintiffs' retention of the

checks, without cashing them, constituted acceptance of the defendants' offer of accord. In *Kelly* v. *Kowalsky*, 186 Conn. 618, 622, 442 A.2d 1355 (1982),[83] this court concluded that "the mere retention of a conditional check" does not, by itself, constitute acceptance of an offer of accord.[84] The court stated that "[w]hen a creditor immediately and fully explains the grounds for his retention of a conditional check, and when a debtor acquiesces in that retention, there is no reason of policy to find that the creditor has agreed to accept an offer of accord which he expressly has rejected." Id.[85]

---

[83] The factual setting of *Kelly* v. *Kowalsky*, supra, 186 Conn. 618, is also instructive. In *Kelly*, the parties disputed whether the defendants had, pursuant to a collective bargaining agreement, properly made contributions to the plaintiffs' union funds. Id., 619. The defendants sent the plaintiffs four checks, along with a cover letter stating that the checks constituted full payment of all claims. Id. The plaintiffs immediately informed the defendants that they would hold, but not cash, the checks, pending further discussions on the matter. Id.

Approximately one month later, the plaintiffs notified the defendants that the checks were insufficient to cover the deficiencies. Id., 619–20. The defendants again informed the plaintiffs that the checks were sent in full satisfaction of the claims, but did not ask for the checks to be returned or order payment on them stopped. Id., 620. The plaintiffs retained possession of the checks until the trial, which was two years after these discussions. Id. The trial court had concluded that the plaintiffs' "retention of the checks constituted an accord and satisfaction and therefore discharged the defendant debtors from their remaining indebtedness." Id., 619.

[84] In *Kelly* v. *Kowalsky*, supra, 186 Conn. 621, this court distinguished the facts of that case from situations wherein the accord check had already been cashed. The court also distinguished the facts of *Kelly* from other cases, specifically *Hanley Co.* v. *American Cement Co.*, 108 Conn. 469, 472, 143 A. 566 (1928), and *Borst* v. *Ruff*, 137 Conn. 359, 361–62, 77 A.2d 343 (1950), wherein the creditors received and retained the debtors' checks for an extended period without notifying them of their disagreement with the proposed accord. *Kelly* v. *Kowalsky*, supra, 621.

[85] In so concluding, the court noted that "the creditors' express objection to the debtors' tender is uncontested. The debtors' acquiescence is demonstrated by the uncontradicted evidence that the defendants' attorney, upon inquiry whether the plaintiffs should hold the disputed checks, replied that the plaintiffs should do what they wanted. Furthermore, the defendants, fully on notice of the plaintiffs' intentions, never requested the return of their checks. Finally, the defendants chose not to avail themselves of their right to stop payment on the checks . . . which would have allowed them

We conclude that the trial court did not abuse its discretion in denying the defendants' motion to set aside the verdict on the plaintiffs' claims arising out of the UCONN project, particularly in light of the conflicting evidence presented to the jury, and the relevant law of accord and satisfaction as articulated in *B & B Bail Bonds Agency of Connecticut, Inc.* v. *Bailey*, supra, 256 Conn. 212–13, and *Kelly* v. *Kowalsky*, supra, 186 Conn. 622. The trial court properly deferred to the jury's factual determination. Inasmuch as there is a reasonable basis for the jury's verdict on this issue, particularly that the tendered checks were never cashed, and the close temporal proximity between the settlement efforts and subsequent action, we abide by our well established "disinclin[ation] to disturb jury verdicts, and . . . accord great deference to the vantage of the trial judge, who possesses a unique opportunity to evaluate the credibility of witnesses. . . . The concurrence of the judgments of the [trial] judge and the jury . . . is a powerful argument for upholding the verdict." (Citation omitted; internal quotation marks omitted.) *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 534, 733 A.2d 197 (1999). We conclude that the trial court properly determined that there was a reasonable basis for the jury's verdict in favor of the plaintiffs on the claims arising out of the UCONN project and, therefore, the court did not abuse its discretion by denying the defendants' motion to set aside the verdict on those counts.

The judgment is reversed in part and the case is remanded to the trial court with direction to reinstate the jury's verdict for the plaintiffs on the claims arising out of the Wolcott School project, and for further proceedings as to the determination of the plaintiffs' attorney's fees; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.

full access to the funds covered by the disputed checks." (Citation omitted.) *Kelly* v. *Kowalsky*, supra, 186 Conn. 622–23.